556 S.E.2d 403

**The STATE, Respondent,**

v.

**Charles M. "Rickey" STUCKEY, Jr., Appellant.**

No. 3404.

Court of Appeals of South Carolina.

Heard Sept. 5, 2001.

Decided Nov. 5, 2001.

Rehearing Denied Dec. 20, 2001.

Certiorari Denied March 6, 2002.

Assistant Appellate Defender Robert M. Dudek, of SC Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General S. Creighton Waters, all of Columbia; and Solicitor Jay E. Hodge, Jr., of Darlington, for respondent.

STILWELL, Judge:

In this consolidated appeal, Charles "Rickey" Stuckey, Jeffery Walls, Martin McIntosh, and Leroy Staton appeal their convictions for murder, kidnapping, first degree criminal sexual conduct (CSC), and criminal conspiracy, and Alfonzo Staton appeals his convictions for murder, kidnapping, and criminal conspiracy. Each appellant challenges the trial court's denial

of his severance and directed verdict motions. Additionally, McIntosh argues the trial court erred in allowing the prosecutor to improperly comment on his silence during police questioning. In this opinion, we affirm the trial court's decision to try appellants jointly and affirm its denial of Stuckey's directed verdict motions.[1]

## FACTUAL/PROCEDURAL HISTORY

Stuckey and his co-appellants were each indicted on charges of murder, kidnapping, first degree CSC, and criminal conspiracy. Appellants were tried jointly with Robert Graham, who was indicted for the same charges with the exception of murder.[2] The State presented the following evidence at trial.

### *State's Case*

On the evening of November 12, 1994, Victim's sister picked her up to go shopping. Victim's car was inoperable, and she had hired Ringo Pearson to repair it. Victim and Pearson were outside Victim's home talking when the sister arrived. Sister brought Victim home an hour or so later. The two were supposed to talk on the telephone at 10:00 p.m., but Victim never called and Sister's calls went unanswered. Victim's family attempted unsuccessfully to reach her throughout the evening, and after Victim failed to attend a planned event the next day, Sister called the police and filed a missing person's report.

Police discovered Victim's body floating in a creek near Burnt Factory Road on November 24, 1994. Her wrists and ankles were bound together behind her back with duct tape. With the exception of her forehead, part of her chin, and a small area at the tip of her nose, her face was entirely covered with duct tape which was wrapped around her head. Her pants were pulled down below her knees. Her body was bloated and in a state of decomposition. A preliminary identi-

---

1. We address the severance issue as it applies to all appellants in this opinion. Each of Stuckey's co-appellant's other issues are addressed in separate opinions.

2. A number of other people were charged in connection with these crimes, including Ringo Pearson. Some of the other people charged, including certain State witnesses, pled guilty to various offenses.

fication was made based on the clothing Victim was last seen wearing, but the condition of the body prevented further visual identification. Police used fingerprints and palm prints to positively identify the body.

Doctor Sandra Conradi, who performed Victim's autopsy, concluded the cause of death was asphyxiation caused by encasement of Victim's head with duct tape. Victim could not breathe enough to remain alive despite a small opening in the duct tape near the tip of her nose because the tape was applied to her face so tightly that it severely compressed her nose. Doctor Conradi opined Victim died within minutes of having her face bound with duct tape, but could not completely rule out the possibility that she drowned because drowning is a difficult diagnosis to eliminate. Doctor Conradi testified she believed Victim died before she was placed in the creek, but did not offer any opinion as to how long she had been dead at that time. She did conclude, however, that Victim died several days before her autopsy and may have died as early as November 12. Doctor Conradi found no seminal fluid or injury in the genital area but explained the water and decomposition may have affected those findings.

The investigation led police to an abandoned house where Stuckey formerly lived. There officers discovered duct tape, Victim's prescription safety eyeglasses, and an earring matching one found on her body.

Officers approached Jeffery Walls' brother, Sam, asking him about duct tape. Sam told them he had a partial roll of duct tape underneath his car seat and, at their request, turned it over to them. At trial, Sam explained he obtained the tape from his mother's home, where Jeffery lived, to use on some electrical wires in the car. He testified that at the time of Victim's disappearance, Pearson was performing body work on his car. On cross-examination, however, Sam stated he did not take the tape out of his mother's home until after Pearson finished working on his car in late October or early November.

John Barron, a SLED expert in trace evidence analysis, testified the duct tape Sam Walls provided was identical in structure and composition to the tape removed from Victim's body and the tape discovered at the abandoned house. Upon further investigation, Barron discovered the tape was manu-

factured by an English company which does not directly market or sell it in the United States. The company sells the tape primarily in England, exporting only one percent of the total production to other European countries.

## Dwayne Sloan's Testimony

Dwayne Sloan testified he spent the evening of November 11 and the morning of November 12 with his brother, Lee, and Ringo Pearson, Jeffery Walls, and Alfonzo Staton. Sloan left the group on the afternoon of the 12th to go to work at Burger King. He arrived early for his 4:00 p.m. shift. During Sloan's break, Jeffery Walls, Pearson, and Alfonzo came to the Burger King, Walls and Pearson arriving together and Alfonzo by himself. The group stood outside and talked for a few minutes. When Pearson decided to leave, Sloan and Alfonzo asked him where he and Walls were going. Pearson responded he was "going to get [Victim [3]] to suck his d* *k." Pearson and Walls then left together and Alfonzo left alone five or ten minutes later.

Sloan also testified that during a trip to North Carolina on November 29, Pearson confessed to killing Victim. On the trip, Pearson asked Sloan and Alfonzo whether the police had questioned either of them about a murder. When they both said they had not been questioned, Pearson stated the police did not have enough evidence to prove he committed the crime. He then recounted to them the following events: He and Victim, whose car he had worked on, had pulled alongside a dirt road and began having sex in the back seat. When Victim pulled away, Pearson slapped her and yelled at her. When she continued to resist, he tied her hands behind her back. Despite her pleas, Pearson drove down Burnt Factory Road and pushed her in the water.

## Jeffrey Graham's Testimony

Jeffrey Graham testified about a visit Leroy Staton and Pearson made to the home he shared with his sister and father in November 1994. They wanted to see Jeffrey's sister and spoke with her in another room. Afterward, they invited Jeffrey to a party. In a statement to police, Jeffrey said

---

**3.** Pearson referred to Victim by her first name.

Leroy and Pearson said somebody had a woman at the party and Leroy asked if he wanted to ride with them and "get a piece."[4] Jeffrey told Leroy and Pearson he was not going to the party. At a federal grand jury proceeding, Jeffrey explained when he was invited to come "get a piece," he understood that "they had a woman that everybody was going to do something [to]."

Jeffrey and Stuckey worked at a garage for Stuckey's dad, Mack Stuckey. Jeffrey told police that the day after he was invited to the party, he overheard Stuckey tell Mack and Joe Stuckey at the garage, "I want that bitch out of my trailer." Mike Spears and Leroy were also there. Martin McIntosh was also present, but Jeffrey did not believe Martin could hear the conversation because he was outside at the time. The same day, Jeffrey rode with his cousin, Robert Graham ("Graham"), to the trailer where Graham and Stuckey lived. Jeffrey did not go inside, but saw Stuckey, Leroy, Alfonzo, and others in the yard drinking.

### Danny Davis' Testimony

Danny Davis testified he went to a cookout at Graham and Stuckey's. Leroy, Stuckey, Graham, and others were present. When he went inside to get a beer he saw Victim lying on the couch. Her ankles and mouth were taped and her wrists were taped behind her back. He then returned to the cookout. When asked why he did not say anything about the woman to the others, Davis replied: "Because I didn't know what to think. I didn't know if it was a game or what was going on." After the food was cooked, Davis went home some seventy-five yards away while the others remained.

Davis returned to the trailer about dusk at Stuckey's invitation. Leroy, Alfonzo, Walls, McIntosh, and Pearson were at the party. Leroy, Stuckey, and Graham were inside the trailer. When he went to the bathroom, Davis saw Victim in the bedroom. She was on the bed and tied up in the same manner as before. About thirty minutes after Davis arrived, he and Robert Ransom, who also lived nearby and is disabled, asked Pearson for a ride home. Ransom and Davis were told

---

4. Jeffrey denied telling police that Leroy invited him to "get a piece," but admitted the comments were included in his statement.

to get in Pearson's car. Pearson and Stuckey then came from around the trailer with Victim, whose mouth, legs, and hands were still taped, and put her in the car. Walls also got in the car, and the group left. Instead of taking Ransom and Davis home, Pearson drove to an old abandoned house in the country where Stuckey previously lived. Stuckey and Pearson carried Victim onto the porch and placed her on a couch which they then carried inside the house. Ransom and Davis were then driven home.

The next evening, Davis met Stuckey and Pearson at Ransom's home. Stuckey said "we've got that girl and we've got to do something with her or all of us are going to be in trouble." Ransom asked if Stuckey and Pearson would take him and Davis to get something to drink, and they agreed. Pearson left to get his car and returned a few minutes later with Leroy and Alfonzo. Stuckey, Davis, and Ransom got in the car and Pearson drove to an abandoned house. McIntosh and Walls were standing outside the house. Stuckey and Pearson went inside and brought Victim out. Her ankles were taped as before, but Davis noticed that instead of tape over only her mouth, "just about her whole head was taped up." Stuckey and Pearson "tote[d]" her to the car and placed her in the back seat with Ransom, Davis, Alfonzo, and Leroy. Walls also climbed in the back seat, and Pearson, Stuckey, and McIntosh sat in the front seat.

Davis testified Victim fell over on Ransom when she was placed in the car. Ransom asked Davis to pull her off him and Stuckey responded, "Bobby, you don't have to worry about her bothering you because she's already dead."[5] With everyone in the car, they drove to Burnt Factory Road. When they arrived at the creek, Victim was thrown in the water. Davis did not see who threw her in the water; he just heard a big splash.

### Bobby Ransom's Testimony

Bobby Ransom testified Davis and Stuckey invited him to the cookout and pushed him to the trailer in his wheelchair. Graham, Pearson, Walls, Alfonzo, Leroy, and Betty Lou

---

5. Davis testified at a prior hearing that Victim was not moving or breathing in the car.

Caulder were outside the trailer cooking, drinking alcohol, and smoking marijuana and crack cocaine. When Ransom approached the others, Stuckey asked if he wanted to see "that 'ol gal" they had inside the trailer. Caulder and Stuckey helped Ransom into the trailer, where he saw Victim on the couch opposite the front door, bound with tape on her face and hands. She was alive and her eyes were open. Ransom recalled, "then I spoke up and told them that they needed to move that girl laying on that couch like that. And I was implicating it to Ricky Stuckey, but there was three or four in there like I named while ago." Stuckey asked for and received help to move Victim to the back of the trailer.

Ransom eventually went home but returned later, at Stuckey and Davis' invitation, for a party. In addition to Davis and Stuckey, he saw Leroy, McIntosh, Walls, Pearson, Graham, and Caulder there. He was asked if he wanted to see Victim again. Several of the others helped him to the bedroom door. He saw Victim on the bed, bound as before. Then someone in the group touched Ransom and asked if he wanted "some," indicating he could have sex with her. Ransom began "shaking and bouncing" and asked to be taken back to his wheelchair.

Ransom returned to the party and later asked if someone could give him a ride home. When asked why he wanted to go home, he said "because everybody here is going to be in trouble with that girl there like that." He was then told to get in Pearson's car. Stuckey and some others were talking when Ransom added that Victim should never have been brought to the trailer and repeated his belief that all of the partygoers were going to be in trouble. He overheard Stuckey and two others talking about taking Victim to a house where Stuckey formerly lived. Davis agreed to go with Ransom to help him back inside his home and the two got in the car. Then two men walked Victim out of the trailer and put her in the car. Pearson, Stuckey, and Walls got in the car. Instead of taking Ransom home, they drove to an abandoned house where two of them placed Victim on a couch on the porch and carried her inside. Pearson, Stuckey, Walls, and Davis left her there alive, took Ransom home, and returned to the party.

The next night, Davis, Pearson, and Stuckey came to Ransom's home. Stuckey mentioned they still had Victim. Ransom suggested they turn her loose out in the country somewhere, maybe on Burnt Factory Road. Stuckey asked what they were going to do about her and then asked Pearson to go get the car. Ransom told Stuckey and Davis he thought they "were in a mess." Stuckey asked Ransom and Davis to ride with him and they got in the car with Pearson, who was driving, Alfonzo, and Leroy.

Pearson drove the group to the abandoned house where Victim was left the evening before. Ransom saw Walls and McIntosh coming out of the house onto the porch as they arrived. Some of the men got out of the car, had a discussion on the steps, and went inside the house. They emerged shortly thereafter, "toting" Victim, and put her in the backseat between Ransom and Davis. Everyone else got in the car and someone said they should go to Burnt Factory Road. Ransom would not look at Victim but at one point became agitated and exclaimed, "someone get this bitch from crying all over on me; I can't take it." Some of the others laughed at Ransom when Stuckey repeated his request. Stuckey told Davis to move Victim's head off Ransom, and he did. At trial, Ransom testified he thought at the time she was crying and talking. In retrospect he believed she was not, but that he "was just out of it."

Pearson drove them to a bridge by the creek. When they stopped, someone said "everybody get out." Ransom was the last one out, getting out of the car only after someone dragged Victim out by her feet. As he pulled himself up out of the car, he saw something hitting the water. He looked to see where everybody was and then realized it must have been Victim in the water.

### Jerry Ward's Testimony

Finally, the State called Jerry Ward, who was in jail with Pearson and several of his co-defendants while they awaited trial. Ward testified he overheard Walls and Pearson arguing over which one of them had sex with Victim first. Stuckey, on the other hand, claimed he did not have sex with her but said he watched while Pearson did. When asked whether Stuckey and Walls ever told him how Victim "got tied up," Ward stated

they told him that after Victim was taken to the abandoned house they returned with Pearson, who went inside and taped Victim up while they waited outside in the car. They said Pearson taped her up because she was making noises. Eventually, Victim's face was taped up, although Ward did not know when.[6]

After the State rested, appellants and Graham moved for directed verdicts. The trial court denied each directed verdict motion.

### Defense Cases

Stuckey called his girlfriend, Myra Bennett, who testified she never saw any girl tied up at his trailer. Stuckey testified he spent every day or every other night with Bennett in November of 1994. He further testified he and Pearson did not "hang out" after a falling out they had in late 1993 or early 1994. Stuckey admitted to having a cookout at his trailer. He denied having a girl taped up inside, however, and claimed he did not hear about Victim's murder until Pearson's arrest. Martin McIntosh, Leroy Staton, and Robert Graham also testified and offered witnesses in their defense. Jeffery Walls and Alfonzo Staton presented no evidence.

The jury found Leroy, Stuckey, Walls, and McIntosh guilty as charged; Alfonzo not guilty of CSC but guilty on the remaining charges; and Graham guilty only of criminal conspiracy. The trial court sentenced each to life imprisonment for murder and five concurrent years for conspiracy. Graham also received a five year sentence for conspiracy. Each appellant convicted of CSC received a consecutive thirty year sentence. Because each appellant was convicted and sentenced for murder, the trial court declined to impose any sentence for the kidnapping conviction in compliance with South Carolina Code Ann. § 16–3–910 (Supp.2000). This appeal follows.

## LAW/ANALYSIS

Appellants argue the trial court abused its discretion in refusing their requests for separate trials. We find no error.

---

**6.** Ward's testimony is also unclear as to who taped Victim's face.

## I. Severance

■ Motions for severance are addressed to the discretion of the trial court. *State v. Nichols*, 325 S.C. 111, 122, 481 S.E.2d 118, 124 (1997). "A severance should be granted only when there is a serious risk that a joint trial would compromise a specific trial right of a co-defendant or prevent the jury from making a reliable judgment about a co-defendant's guilt." *Hughes v. State*, 346 S.C. 554, 559, 552 S.E.2d 315, 317 (2001) (emphasis removed). "A proper cautionary instruction may help protect the individual rights of each defendant and ensure that no prejudice results from a joint trial." *Id.* "An appellate court should not reverse a conviction achieved at a joint trial in the absence of a reasonable probability that the defendant would have obtained a more favorable result at a separate trial." *Id.* (citing *People v. Greenberger*, 58 Cal.App.4th 298, 68 Cal.Rptr.2d 61, 86 (1997)); *see also State v. Dennis*, 337 S.C. 275, 281–82, 523 S.E.2d 173, 176 (1999) (the denial of a severance motion will not be reversed absent an abuse of discretion and a showing of resulting prejudice). Furthermore, as murder co-defendants, appellants were not entitled to separate trials by right. *State v. Kelsey*, 331 S.C. 50, 73, 502 S.E.2d 63, 75 (1998).

■ First, we reject the argument asserted by several of the appellants that the joint trial resulted in a "spill-over effect" from evidence admitted against other co-defendants. Because the State alleged the men conspired and acted in concert to commit the substantive crimes charged, all of the State's evidence admitted in their joint trial would have been admissible against each of them if they had been granted separate trials. *See State v. Wilson*, 315 S.C. 289, 294, 433 S.E.2d 864, 868 (1993) (noting the State is granted great latitude in introducing circumstantial evidence of a conspiracy from its commencement to its conclusion and that substantive crimes committed in furtherance of the conspiracy constitute circumstantial evidence of the conspiracy's existence, object, and scope); *State v. Mikell*, 257 S.C. 315, 324, 185 S.E.2d 814, 817–18 (1971) (acts and statements of a co-conspirator made in furtherance and during a conspiracy are admissible to prove the existence of a conspiracy); Rule 801(d)(2)(E), SCRE (statements of a co-conspirator during the course of and in furtherance of the conspiracy are by definition not hearsay).

Indeed, had the court granted the motions, the result would have been multiple presentations of the State's entire case, including the lengthy testimony of the two primary witnesses, Davis and Ransom.

■ Appellants also contend their joint trial caused confusion and permitted the jury to consider the guilt of each individual in a vague way. Essentially, appellants argue the jury could not distinguish between the individual defendants in reaching its numerous verdicts. However, the trial court repeatedly instructed the jury to consider the evidence separately as to each defendant. Our supreme court has previously held such cautionary instructions "may help protect the individual rights of each defendant and ensure that no prejudice results from a joint trial." *State v. Dennis*, 337 S.C. at 280, 523 S.E.2d at 176; *see also State v. Holland*, 261 S.C. 488, 494, 201 S.E.2d 118, 121 (1973) (holding trial court's cautionary instructions to the jury in a joint trial "protected the rights of each individual appellant . . . ."). The jury obviously followed these instructions, as its return of twenty guilty verdicts and three not guilty verdicts demonstrates it was able to make the very distinctions appellants claim impossible.

In summary, no appellant points to a specific trial right which was violated by the joint trial. The appellants have also failed to demonstrate their joint trial prevented the jury from making a reliable judgment on any one defendant's guilt. Thus, because none of the appellants have shown that a separate trial would have resulted in a more favorable result, we affirm the trial court's decision to proceed with a joint trial.

## II. Directed Verdict

Stuckey contends the trial court erred in refusing to grant a directed verdict in his favor on each of the charges against him. As to the substantive charges, Stuckey does not dispute that these crimes occurred, but rather that the State failed to establish his legal culpability in them. We disagree.

■ In ruling on a motion for a directed verdict, the trial court is concerned with the existence or non-existence of evidence, not with its weight. *State v. Fennell*, 340 S.C. 266, 270, 531 S.E.2d 512, 514 (2000). The court should grant the motion if the evidence "merely raises a suspicion that the

accused is guilty." *State v. Ballington,* 346 S.C. 262, 271, 551 S.E.2d 280, 285 (Ct.App.2001), *petition for cert. filed* (Sept. 21, 2001); *see also State v. Schrock,* 283 S.C. 129, 132, 322 S.E.2d 450, 452 (1984). However, the court should deny the motion and submit the case to the jury if there is "any direct evidence or substantial circumstantial evidence which reasonably tends to prove the guilt of the accused, or from which his guilt may be fairly or logically deduced." *Fennell,* 340 S.C. at 270, 531 S.E.2d at 514. On review of the denial of a motion for a directed verdict, this court must view the evidence in the light most favorable to the State and if there is any direct evidence or substantial circumstantial evidence reasonably tending to prove the accused's guilt, we must find the trial court properly submitted the case to the jury. *Id.*

Viewing the evidence in the light most favorable to the State, and without passing on its weight, we find no error in the trial court's decision to submit Stuckey's entire case to the jury.[7]

## A. Kidnapping

Kidnapping occurs when a person unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away any other person by any means without authority of the law. S.C.Code Ann. § 16–3–910 (Supp.2000). Kidnapping is a continuing offense, which "commences when one is wrongfully deprived of freedom and continues until freedom is restored." *State v. Tucker,* 334 S.C. 1, 13, 512 S.E.2d 99, 105 (1999).

Although the evidence presented does not establish whether Stuckey participated in Victim's initial seizure or confinement, the State offered ample evidence that he partici-

---

7. Stuckey and his co-defendants challenged Davis' and Ransom's credibility as well as the accuracy of their accounts. The appellants, including Stuckey, have maintained this challenge to this court. Because we consider only the existence of evidence in reviewing the denial of a directed verdict, however, witness credibility is not a proper inquiry for our consideration. *Id.* (upon review of the denial of a directed verdict, the appellate court must consider the existence of evidence rather than its weight); *State v. Scott,* 330 S.C. 125, 131 n. 4, 497 S.E.2d 735, 738 n. 4 (Ct.App.1998) (on appeal from the denial of a directed verdict, issues of witness credibility are solely for the jury, not the appellate court).

pated in her ongoing kidnapping, which lasted until the time of her death. *State v. Jefferies*, 316 S.C. 13, 23 n. 12, 446 S.E.2d 427, 433 n. 12 (1994) (noting " 'kidnapping is a continuing offense as long as the kidnapped person is deprived of his freedom' ") (citation omitted). Ward, Stuckey's fellow inmate, testified Stuckey admitted watching Pearson have sex with Victim while she was kidnapped. At some point after she was initially abducted, Victim was taken to Stuckey's trailer, where she was held bound and gagged. Stuckey held a cookout and party while she was held there and invited Ransom to come inside and look at her. When Ransom expressed concern about her being on the couch directly across from the front door, Stuckey instructed others to move her to the bedroom, which was better hidden from view. Davis testified Stuckey, along with Pearson, moved her from the trailer to the abandoned house, where she was left. While in jail awaiting trial, Stuckey and Walls admitted to Ward they later returned to the house with Pearson and waited while he taped Victim up some more to prevent her from making noises. Finally, Stuckey returned to the house with the others and, together with Pearson, personally went inside and retrieved Victim. They then laid her in the car and drove her to the creek.

Though it is contradicted by other evidence, Ransom's statement about Victim crying on him during the car ride to the creek constitutes direct evidence she was alive during at least part of that journey.[8]

Because this evidence reasonably tends to prove Stuckey actively participated in Victim's ongoing kidnapping, the trial court properly denied his directed verdict motion on this charge.

### First Degree Criminal Sexual Conduct

Any person who commits a sexual battery upon a victim is guilty of criminal sexual conduct if one or more of the following circumstances are present:

---

**8.** Direct evidence is "evidence based on actual knowledge and proves a fact without inference or presumption." *State v. Salisbury*, 343 S.C. 520, 524 n. 1, 541 S.E.2d 247, 248–49 n. 1 (2001). Circumstantial evidence "immediately establishes collateral facts from which the main fact may be inferred, and is typically characterized by inference or presumption." *Id.*

(a) The actor uses aggravated force to accomplish sexual battery.

(b) The victim submits to sexual battery by the actor under circumstances where the victim is also the victim of forcible confinement, kidnapping, robbery, extortion, burglary, housebreaking, or any other similar offense or act.

(c) The actor causes the victim, without the victim's consent, to become mentally incapacitated or physically helpless by administering, distributing, dispensing, delivering, or causing to be administered, distributed, dispensed, or delivered a controlled substance, a controlled substance analogue, or any intoxicating substance.

S.C.Code Ann. § 16–3–652(1) (Supp.2000).

 The evidence also supports the trial court's refusal to grant Stuckey a directed verdict on the CSC charge. According to Ward's testimony, Stuckey admitted he watched Pearson sexually assault Victim while she was kidnapped. Stuckey held a party at his home where Victim was being held and at least once invited Ransom to come look at her. Later, he either invited Ransom to have sex with her or stood by as others did. The evidence reveals Stuckey orchestrated or at minimum permitted others to hold Victim at his home as a sex-slave to partygoers and friends. Although the State presented no evidence Stuckey personally sexually assaulted Victim, the trial court properly submitted this charge to the jury because the State introduced sufficient evidence he either aided and abetted others in sexually assaulting Victim or that he joined with others to commit the same. *See State v. Burdette*, 335 S.C. 34, 45, 515 S.E.2d 525, 531 (1999) (holding that any person, who aids, abets, and encourages another in and is present during the commission of a crime is guilty as a principal); S.C.Code Ann. § 16–1–40 (Supp.2000) ("A person who aids in the commission of a felony or is an accessory before the fact in the commission of a felony by counseling, hiring, or otherwise procuring the felony to be committed is guilty of a felony and upon conviction, must be punished in the manner prescribed for the punishment of the principal felon."); *State v. Langley*, 334 S.C. 643, 648, 515 S.E.2d 98, 101 (1999) (holding that under the "hand of one, the hand of all" theory,

"one who joins with another to accomplish an illegal purpose is liable criminally for everything done by his confederate incidental to the execution of the common design and purpose.").

## Murder

" 'Murder' is the killing of any person with malice aforethought, either express or implied." S.C.Code Ann. § 16–3–10 (1985). " 'Malice' is the wrongful intent to injure another and indicates a wicked or depraved spirit intent on doing wrong." *State v. Kelsey*, 331 S.C. 50, 62, 502 S.E.2d 63, 69 (1998).

The State also presented sufficient evidence to allow Stuckey's murder charge to go to the jury. Stuckey told others at the garage he wanted "that bitch" out of his trailer. The evening after he and Pearson took Victim, alive, to the abandoned house, Stuckey told Ransom and Davis that they still had Victim and needed to do something with her or they were all "going to be in trouble." When they returned to the house that evening, Pearson and Stuckey went inside. When they brought her out, her face was completely bound with duct tape. Stuckey's statement to Ransom that he did not have to worry about Victim bothering him because she was already dead indicates he knew she could not breathe with the duct tape applied so tightly to her face. The evidence concerning Stuckey's actions and words constitutes substantial evidence that he participated in Victim's murder, combined with others to murder her, or aided and abetted one or more persons in murdering her. *See Burdette*, 335 S.C. at 45, 515 S.E.2d at 531(aiding and abetting); *Langley*, 334 S.C. at 648, 515 S.E.2d at 101 (hand of one, the hand of all). The trial court properly denied Stuckey's motion for a directed verdict on this charge.

## Criminal Conspiracy

Conspiracy is the "combination between two or more persons for the purpose of accomplishing an unlawful object or lawful object by unlawful means." S.C.Code Ann. § 16–17–410 (Supp.2000); *see also State v. Gunn*, 313 S.C. 124, 133–34, 437 S.E.2d 75, 80 (1993). The gravamen of conspiracy is an agreement or combination. *Id.* at 134, 437 S.E.2d at 80. However, a formal agreement is not necessary to establish a conspiracy, as the conspiracy may be proven by

"circumstantial evidence and the conduct of the parties." *State v. Bultron,* 318 S.C. 323, 334, 457 S.E.2d 616, 622 (Ct.App.1995); *see State v. Mouzon,* 321 S.C. 27, 32, 467 S.E.2d 122, 125 (Ct.App.1995) (the substantive crimes themselves constitute circumstantial evidence of the existence, scope, and object of the conspiracy). " 'What is needed is proof they intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged.' " *Gunn,* 313 S.C. at 134, 437 S.E.2d at 80–81 (quoting *United States v. Evans,* 970 F.2d 663 (10th Cir.1992)).

The evidence of Stuckey's participation in these substantive crimes with Pearson, the other appellants, and others, combined with his own words about Victim, are more than sufficient evidence of his guilt on the conspiracy charge. *State v. Wilson,* 315 S.C. 289, 294, 433 S.E.2d 864, 868 (1993) (conspiracy does not require overt acts but may be proven by overt acts done in furtherance of the conspiracy, including commission of the substantive crimes).

## CONCLUSION

The trial court did not abuse its discretion in refusing to grant appellants' motions for separate trials. The court also properly refused to grant Stuckey's directed verdict motions. Accordingly, his convictions are

**AFFIRMED.**

GOOLSBY and HUFF, JJ., concur.