661 S.E.2d 122

**The STATE, Respondent,**

v.

**Keith Anthony SIMS, Appellant.**

No. 4371.

Court of Appeals of South Carolina.

Heard April 8, 2008.
Decided April 17, 2008.
Rehearing Denied May 22, 2008.

Joseph L. Savitz, III, Chief Appellate Defender, of Columbia, for Appellant.

Henry Dargan McMaster, Attorney General, John W. McIntosh, Chief Deputy Attorney General, Donald J. Zelenka, Assistant Deputy Attorney General, Melody J. Brown, Assistant Attorney General, and Solicitor Warren B. Giese, all of Columbia, for Respondent.

ANDERSON, J.:

Keith Anthony Sims appeals his murder conviction, arguing the trial judge allowed the State's witness to relate a non-testifying third party's statement, violating Rule 802, SCRE. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

Sims shot and killed Brian Anderson, and with the help of Natalie English, Derrick Ruff and Nikki Davis, hid the body and attempted to hide or destroy all other evidence. On December 30, 2003, the night of the shooting, Anderson and Sims attended a birthday party, and Anderson gave Sims a ride home. The two men engaged in a conversation about their past disagreements, and Anderson spoke of taking care of his "beefs" before the New Year. Previously, the men were in a dispute over whether Sims owed Anderson money. Sims testified, during their ride home, he believed Anderson was reaching under his seat to obtain a firearm and Sims fatally wounded Anderson with a weapon he had on his person. Sims recounted the events:

> We was talking about past arguments that we had. He was telling me that he had all these—all these different guns. He started telling me about how—he started telling me about how he could have then have brought harm to me and my family, how he could have then have brought harm to me and my family.

> So ... when we was pulling up my driveway, he was telling me that I was taking—I was taking food out—out his unborn baby, out his unborn baby's mouth. He said that I was taking food out his unborn baby's mouth.

And when he stopped the car he was telling me that—he was telling me that he was going to take care of all his beefs before the New Year. He was telling me that he was going to—that he was going to end all his beefs before the New Year, that he was going to end all his beefs before the New Year.

And he was reaching underneath his seat. So I thought he was fixing to—he was fixing to grab him a gun to shoot me. So I pulled out my gun. Out of fear I shot.

. . .

. . . I thought he was reaching for his gun. So I thought he was reaching for his gun to shoot me and kill me. So out of fear I pulled my gun out and shot.

When asked by his counsel whether he intended to kill Anderson, Sims replied:

No. I didn't mean to kill him. I was pulling my gun out because I thought he was fixing to kill me. I guess just out of—out of fear I shot.

Sims enlisted his girlfriend, Natalie English; his friend, Derrick Ruff; and Ruff's girlfriend, Nikki Davis, to hide the body and dispose of the remaining evidence. During her direct examination by the State, Davis proffered:

Well, it was like around 3 something in the morning and I heard a knock at the door. And I wasn't going to answer the door. I was like, Derrick's mom just kept, you know, telling me to open the door. So I went and I opened the door. And Keith came in with Natalie with his arm folded.

. . .

He told me to wake up "Black", which is Derrick, and I told him I can't get him up. You just—you get him up yourself, basically. So he started hitting on Derrick, you know, to get him up. And Derrick got up. . . .

. . .

So he started hitting him to get him up. And Derrick finally got up and told him, you know, to go in the back. And they went to the back and they started talking. Which Natalie, you know, she was already in. She came. She sat—

. . .

So I just started rubbing her back and telling her that everything was going to be all right and stuff. And she wouldn't tell me. I kept asking her what was going on. She wouldn't tell me what was going on. And so she asked me if I wanted to go to Charleston. And I told her, yeah, I needed to go to Charleston because at the time I was two months pregnant with my daughter and I needed to get my Medicaid card and my social security card and stuff like that. So I told her, yeah, I was going to go. So I started getting dressed and stuff like that. And then at that time Keith came out first, and Derrick he was still in the kitchen or whatever. And Keith asked me whether or not I was going or not. I told him, yeah, I was going. And he asked me if they had—if we had any bricks or anything like that. So I told him, I don't know. Just go look in the backyard.

. . .

. . . And we went to a Shell station afterwards. And Derrick got out to get gas. And at the time it was just— and Natalie got out and she went in the store. And at the time it was just me and Keith inside the car. And, you know, I was joking with him and stuff, just like, why didn't you get me anything for my birthday and stuff like that. You know, he gave me $10 for my birthday or whatever. And he told me to go inside the store to make sure Natalie was getting everything that he told them to get.

So I got out of the car and I went and I just peeked my head inside the store. And at that time she had, you know, like the gloves and stuff like on top of the counter. So I figured that's what he told her to get. And I came back out into the car. And everybody came and they got inside the car. And then we headed to—

. . .

And we parked right in front of the lady's house. And I just figured that they were going to go. And so we all were going to go inside the house. But me and Natalie stayed inside the car and Keith and Derrick got out. And they started toting like this long thing I guess to a car, and a chain, you know, some bricks, just toting it to the back of the house right behind me.

. . .

The next thing I knew he [Sims] sped from behind the house inside of another car. And that's when I, you know, started pushing Natalie. I'm asking her what's going on? Did he steal a car or what's going on? Where did he that from and stuff like that. And then she told me, you know, Keith had murdered somebody....

. . .

Keith dragged him out and he started to drag him by himself but I guess he couldn't do it. And Derrick started to help. And they got like just a little bit with the—he had just got a little bit with the guy and then Derrick came back and got Natalie. And Natalie told me to come on. And— and while we were—or when I got out of the car Keith was—he told me to put my socks on my hands, which I just did what he said. I put my socks on my hands. And Natalie grabbed one leg and I grabbed the other....

. . .

We just started dragging him. And we just dragged him 'til we—we got like to this little balcony thing. And then the guy was just laying like flat on the ground. And Keith was just saying things to him. And we were just trying to get him—we were just trying to get him through.

. . .

... So he said that our next best thing was to just try to lift him up. So we lifted him up and it took a while. And we just finally got him over. And everybody just ran or walked off and never looked back. But before—while we was walking off, Keith stayed and I heard a splash. And I just walked back to the car. And they got back into the car. And Keith brought some things to the car inside a paper bag. And I looked inside the bag and there was a cellphone and a chain and the guy's wallet.

. . .

And we left there and just kept on going. And somewhere during that time we—he [Sims] told me to get rid of it [the contents of the paper bag]. Actually he told me to get ride of it....

Sims objected to Davis being permitted to testify English said "Keith had murdered somebody," arguing it was hearsay. The trial court overruled the objection without comment.

■■■■■

## *ISSUE*

Did the trial judge err in allowing one co-conspirator to testify to another co-conspirator's statement relating Sims' own statement of guilt, characterizing it as non-hearsay, and finding it was calculated to induce participation in disposing of the victim's body and other evidence?

## *STANDARD OF REVIEW*

"In criminal cases, the appellate court sits to review errors of law only." *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006) (citing *State v. Wilson*, 345 S.C. 1, 5, 545 S.E.2d 827, 829 (2001)); *State v. Preslar*, 364 S.C. 466, 472, 613 S.E.2d 381, 384 (Ct.App.2005). The Appellate Courts are "bound by the trial court's factual findings unless they are clearly erroneous." *Baccus*, 367 S.C. at 48, 625 S.E.2d at 220 (citing *State v. Quattlebaum*, 338 S.C. 441, 442, 527 S.E.2d 105, 111 (2000)); *Preslar*, 364 S.C. at 472, 613 S.E.2d at 384.

"The admission of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion." *State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006) (citing *State v. Gaster*, 349 S.C. 545, 557, 564 S.E.2d 87, 93 (2002)); *State v. Douglas*, 369 S.C. 424, 429, 632 S.E.2d 845, 847–848 (2006) (citing *State v. Frank*, 262 S.C. 526, 533, 205 S.E.2d 827, 830 (1974)); *State v. Key*, 256 S.C. 90, 94, 180 S.E.2d 888, 890 (1971); *State v. Funderburk*, 367 S.C. 236, 239, 625 S.E.2d 248, 249–250 (Ct.App.2006); *Preslar*, 364 S.C. at 472, 613 S.E.2d at 384 ("On review, we are limited to determining whether the trial judge abused his discretion."). We will "not re-evaluate the facts based on [our] own view of the preponderance of the evidence but simply [determine] whether the trial judge's ruling is supported by any evidence." *Wilson*, 345 S.C. at 6, 545 S.E.2d at 829; *Preslar*, 364 S.C. at 472, 613 S.E.2d at 384. "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." *Pagan*, 369 S.C. at 208, 631 S.E.2d at 265 (citing *State v. McDonald*, 343 S.C. 319, 325, 540 S.E.2d 464, 467 (2000)); *Douglas*, 369 S.C. at 429–430, 632 S.E.2d at 848 (citing *State v. Manning*, 329 S.C. 1, 7, 495 S.E.2d 191, 194 (1997)); *Funderburk*, 367 S.C. at 239, 625 S.E.2d at 249–50; *Preslar*, 364 S.C. at 473, 613 S.E.2d at 384–

385. "In order for an error to warrant reversal, the error must result in prejudice to the appellant." *Id.* at 473, 613 S.E.2d 381, 625 S.E.2d at 385; *Key,* 256 S.C. at 94, 180 S.E.2d at 890 ("It is only in cases of abuse of discretion which result in prejudice that this court will intervene and grant a new trial."); *State v. LaCoste,* 347 S.C. 153, 160, 553 S.E.2d 464, 468 (Ct.App.2001) ("Rulings on the admissibility of evidence are within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of that discretion resulting in prejudice to the complaining party.") (citing *State v. Hughey,* 339 S.C. 439, 453, 529 S.E.2d 721, 728–729 (2000); *State v. Varvil,* 338 S.C. 335, 340, 526 S.E.2d 248, 251 (Ct.App. 2000)).

## *LAW/ANALYSIS*

Sims contends the trial court erred in allowing Davis to testify regarding statements allegedly made to her by Natalie English, asserting this testimony constitutes impermissible hearsay. We disagree.

### 1. Hearsay

Rule 801(c) of the South Carolina Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." "Hearsay is inadmissible except as provided by statute, the South Carolina Rules of Evidence, or other court rules." *State v. LaCoste,* 347 S.C. 153, 160, 553 S.E.2d 464, 468 (Ct.App.2001) (citing Rule 802, SCRE). "Hearsay testimony is inadmissible because the adverse party is denied the opportunity to cross-examine the declarant." *State v. Mitchell,* 286 S.C. 572, 573, 336 S.E.2d 150, 150 (1985). "[R]eversal is not required unless appellant was prejudiced by the error." *Mitchell,* 286 S.C. at 573, 336 S.E.2d at 150.

Whether an error is harmless depends on the circumstances of the particular case. No definite rule of law governs this finding; rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case. Error is harmless when it "could not reason-

ably have affected the result of the trial." *State v. Key*, 256 S.C. 90, 180 S.E.2d 888 (1971).

*Mitchell*, 286 S.C. at 573, 336 S.E.2d at 150.

## 2. Conspiracy

Section 16–17–410 of the South Carolina Code of Laws provides:

> The common law crime known as "conspiracy" is defined as a combination between two or more persons for the purpose of accomplishing an unlawful object or lawful object by unlawful means.

■ "A conspiracy is a combination or agreement between two or more persons for the purpose of accomplishing a criminal or unlawful object, or of achieving by criminal or unlawful means an object that is neither criminal nor unlawful." *State v. Gunn*, 313 S.C. 124, 133–134, 437 S.E.2d 75, 80 (1993); *State v. Buckmon*, 347 S.C. 316, 323, 555 S.E.2d 402, 405 (2001); *Pinion ex rel. Montague v. Pinion*, 363 S.C. 564, 566, 611 S.E.2d 271, 272 (Ct.App.2005); *State v. Crocker*, 366 S.C. 394, 404, 621 S.E.2d 890, 895–896 (Ct.App.2005) (citing S.C.Code Ann. § 16–17–410 (2003)); *State v. Crawford*, 362 S.C. 627, 638, 608 S.E.2d 886, 892 (Ct.App.2005); *State v. Condrey*, 349 S.C. 184, 191–192, 562 S.E.2d 320, 323 (Ct.App. 2002); *State v. Stuckey*, 347 S.C. 484, 502, 556 S.E.2d 403, 412 (Ct.App.2001); *State v. Gosnell*, 341 S.C. 627, 636, 535 S.E.2d 453, 458 (Ct.App.2000); *State v. Hammitt*, 341 S.C. 638, 644, 535 S.E.2d 459, 462 (Ct.App.2000); *State v. Horne*, 324 S.C. 372, 381, 478 S.E.2d 289, 294 (Ct.App.1996) (noting the crime of conspiracy consists of an agreement or mutual understanding).

■ "The gravamen of the offense of conspiracy is the agreement or combination." *Gunn*, 313 S.C. at 133–134, 437 S.E.2d at 80; *Crocker*, 366 S.C. at 404, 621 S.E.2d at 896; *Stuckey*, 347 S.C. at 502, 556 S.E.2d at 412; *Gosnell*, 341 S.C. at 636, 535 S.E.2d at 458; *Hammitt*, 341 S.C. at 644, 535 S.E.2d at 462 ("The gravamen of conspiracy is the *agreement or mutual understanding*.").

■ "An overt act in furtherance of the conspiracy is not necessary to prove the crime." *Crocker*, 366 S.C. at 404, 621 S.E.2d at 896. "What is needed to establish criminal conspira-

cy is proof [the defendants] intended to act together for their shared mutual benefit within the scope of the conspiracy charged." *Stuckey,* 347 S.C. at 503, 556 S.E.2d at 412–413; *Buckmon,* 347 S.C. at 323, 555 S.E.2d at 405; *State v. Greuling,* 257 S.C. 515, 523, 186 S.E.2d 706, 709 (1972) ("In criminal conspiracy it is not necessary to prove an overt act. The gist of the crime is the unlawful combination. The crime is then complete, even though nothing further is done."); *State v. Crawford,* 362 S.C. 627, 639, 608 S.E.2d 886, 892 (Ct.App. 2005).

Discussing the necessity of an agreement between co-conspirators, the South Carolina Court of Appeals elucidated:

> "To establish the existence of a conspiracy, proof of an express agreement is not necessary, and direct evidence is not essential, but the conspiracy may be sufficiently shown by circumstantial evidence and the conduct of the parties." *Id.* (quoting *State v. Buckmon,* 347 S.C. 316, 323, 555 S.E.2d 402, 405 (2001)). Evidence of direct contact or an explicit agreement between the defendants need not be shown. *State v. Barroso,* 320 S.C. 1, 8, 462 S.E.2d 862, 868 (Ct.App. 1995), *rev'd on other grounds,* 328 S.C. 268, 493 S.E.2d 854 (1997). "It is sufficient to show that each defendant knew or had reason to know of the scope of the conspiracy and that each defendant had reason to believe his own benefits were dependent upon the success of the entire venture." *Id.* at 8–9, 462 S.E.2d at 868.

*Crocker,* 366 S.C. at 404–405, 621 S.E.2d at 896; *Crawford,* 362 S.C. at 639, 608 S.E.2d at 892 ("Once an agreement has been reached, the crime of conspiracy has been committed; no further act need take place."); *Condrey,* 349 S.C. at 192, 562 S.E.2d at 323; *Stuckey,* 347 S.C. at 502–503, 556 S.E.2d at 412 ("However, a formal agreement is not necessary to establish a conspiracy, as the conspiracy may be proven by 'circumstantial evidence and the conduct of the parties.'") (quoting *State v. Bultron,* 318 S.C. 323, 334, 457 S.E.2d 616, 622 (Ct.App.1995)); *Gosnell,* 341 S.C. at 636, 535 S.E.2d at 458 (South Carolina conspiracy law does not require proof of overt acts; circumstantial evidence may prove conspiracy.)

" 'To establish sufficiently the existence of the conspiracy, proof of an express agreement is not necessary, and

direct evidence is not essential, but the conspiracy may be sufficiently shown by circumstantial evidence and the conduct of the parties.'" *State v. Fleming,* 243 S.C. 265, 274, 133 S.E.2d 800, 805 (1963) (quoting 15 C.J.C. Conspiracy § 93a); *State v. Follin,* 352 S.C. 235, 267, 573 S.E.2d 812, 828 (Ct.App. 2002).

██ "Once a conspiracy has been established, evidence establishing beyond a reasonable doubt the connection of a defendant to the conspiracy, even though the connection is slight, is sufficient to convict him of knowing participation in the conspiracy." *State v. Vasquez,* 341 S.C. 648, 654, 535 S.E.2d 465, 468 (Ct.App.2000); *Crawford,* 362 S.C. at 636, 608 S.E.2d at 891 ("[T]he willful and intentional adoption of a common design by two or more persons is sufficient for criminal conspiracy, provided the common purpose is to do an unlawful act either as a means or an end.").

### 3. Co–Conspirator Exception to the Rule Against Hearsay

██ Rule 801(d)(2)(E) of the South Carolina Rules of Evidence defines a co-conspirator's statements, offered against another co-conspirator as non-hearsay: "A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

*State v. Sullivan,* 277 S.C. 35, 42–43, 282 S.E.2d 838, 842–843 (1981), sets forth the well-recognized exception to the rule against hearsay associated with co-conspirator's statements:

In the law of conspiracy, there is a well-recognized exception to the rule against hearsay which permits the statements of one conspirator made during the pendency of the conspiracy, admissible against a co-conspirator, once prima facie evidence of a conspiracy is proved. Thereafter, the acts and declarations of any conspirator made during the conspiracy and in furtherance thereof are deemed to be the acts and declarations of every other conspirator and are admissible against all. *State v. Ferguson, et al.,* 221 S.C. 300, 70 S.E.2d 355 (1952).

In *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the declarations of one conspirator made

in furtherance of the objects of the conspiracy to a third party are admissible against all of the members, but only after proof that each defendant was a member of the conspiracy.

Under *Glasser* there was a preferred order of proof; non-hearsay which established membership in the conspiracy must precede the hearsay declarations. However, order of proof is discretionary with the trial judge and declarations made by a conspirator to a third party may be admitted in advance of evidence which would prima facie establish the existence of the conspiracy. *State v. Rutledge,* 261 S.C. 44, 198 S.E.2d 250 (1973); In accord: *United States v. Vaught,* [485 F.2d 320 (C.A.4 1973)]supra.

... Moreover, once a conspiracy has been established,

"[E]vidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the connection is slight, is sufficient to convict him with knowing participation in the conspiracy. *United States v. Dunn,* 564 F.2d 348, 357 (9th Cir.1977)."

*United States v. Jabara,* 618 F.2d 1319, 1328 (9th Cir.1980).

*State v. Gilchrist,* 342 S.C. 369, 372, 536 S.E.2d 868, 869 (2000), superseded *Sullivan* in a footnote:

Rule 801(d)(2)(E) provides that a statement by a co-conspirator during the course and in furtherance of the conspiracy is not hearsay. Under the Federal Rules of Evidence, this same rule has been interpreted to allow admission of a co-conspirator's statement only where there is evidence of the conspiracy *independent* of the statement sought to be admitted. *See, e.g., United States v. Asibor,* 109 F.3d 1023 (5th Cir.1997); *United States v. Clark,* 18 F.3d 1337 (6th Cir.1994); *United States v. Smith,* 893 F.2d 1573 (9th Cir.1990); *United States v. Urbanik,* 801 F.2d 692 (4th Cir.1986).[FN1] Here, there is no independent evidence of a conspiracy between Robertson and appellant. The fact that Robertson was *indicted* for criminal conspiracy is not sufficient in itself to establish a conspiracy since an indictment is not evidence of the crime charged. 41 Am.Jur.2d INDICTMENTS AND INFORMATIONS § 1.

FN1. Before enactment of the SCRE, precedent of this Court indicates that prima facia evidence of a conspiracy was required to support

the admission of a co-conspirator's statement. *State v. Sullivan,* 277 S.C. 35, 282 S.E.2d 838 (1981).

Further, a statement by a co-conspirator must advance the conspiracy to be admissible under Rule 801(d)(2)(E). *State v. Anders,* 331 S.C. 474, 503 S.E.2d 443 (1998) (admission to crime does not qualify as statement in furtherance of conspiracy).[FN2]

FN2. As explained in *United States v. Arias–Villanueva,* 998 F.2d 1491, 1502 (9th Cir.1993):

> While mere conversation or narrative declarations are not admissible under this rule, statements made to induce enlistment, further participation, prompt further action, allay fears, or keep coconspirators abreast of an ongoing conspiracy's activities are admissible.

An example of a statement by a co-conspirator being inadmissible as hearsay is found in *State v. Anders,* 331 S.C. 474, 476, 503 S.E.2d 443, 444 (1998). In *Anders,* a witness overheard one of the conspirators (Simmons) say " 'Robert [Anders] was going to pay him big for blowing up the building.' " *Id.* Additionally, the witness heard Simmons explain how he set the fire. *Id.* "The trial court ruled the statements were admissible against Anders on the basis they were made by Simmons in the furtherance of a conspiracy, so as to be admissible against both Anders and Simmons." *Id.* The Court of Appeals ultimately affirmed in result, but "held Simmons' statement was not admissible under the co-conspirator exception since, even if made **during** the conspiracy, the statement in no way **advanced** the conspiracy." *Id.* at 476–477, 503 S.E.2d at 444 (emphasis in original). The Supreme Court reversed the Court of Appeals, but agreed with the characterization of the statement as not falling under the co-conspirator exception to the rule against hearsay:

> We agree with the Court of Appeals' holding that Simmons' admission to the crime in no way furthered the conspiracy. *Accord United States v. Posner,* 764 F.2d 1535 (11th Cir. 1985), *cert. denied* (although statements made to "allay suspicions" may be "in furtherance" of conspiracy, "spilling the beans" does not further conspiracy); *United States v. Pallais,* 921 F.2d 684 (7th Cir.1990), *cert. denied,* 502 U.S. 842, 112 S.Ct. 134, 116 L.Ed.2d 101 (1991) (casual admissions of culpability are not "in furtherance" of conspiracy

and are insufficiently reliable to be considered by the jury). Accordingly, the Court of Appeals correctly ruled the statement was not admissible under the co-conspirator exception. *See State v. Sullivan,* 277 S.C. 35, 42, 282 S.E.2d 838, 842 (1981) (exception to rule against hearsay permits statements of one conspirator made during the pendency of the conspiracy, and in furtherance thereof, to be admitted against a coconspirator once prima facie evidence of a conspiracy is proved); *see also* South Carolina Rules of Evidence, Rule 801(d)(2)(E).

*Id.* at 477, 503 S.E.2d at 444.

More recently, a case involving hearsay and co-conspirator's statements is *State v. Anderson,* 357 S.C. 514, 517, 593 S.E.2d 820, 821 (Ct.App.2004). The State alleged Anderson conspired with Jamal Manick and Fred Moss to rob the victim. *Id.* at 515, 593 S.E.2d at 820. Bobby Lukie rode with Moss and Manick to the restaurant where Manick shot and killed Lamont Rappley. *Id.* at 516, 593 S.E.2d at 821. Similarly to the case at hand, Anderson presents a situation where a coconspirator testified for the State [1]:

> At trial, Lukie testified that around 11:00 p.m. on the night of the murder, he drove by a convenience store and noticed Ross and Manick standing outside the store. Lukie stated that when he asked Ross and Manick what they were doing, Ross told him "they had a lick or something like that." Defense counsel objected, arguing this testimony was hearsay. The State argued the testimony was admissible as non-hearsay because the statement was made in furtherance of the conspiracy. The trial court agreed and overruled the defense's objection.

*Id.* at 517, 593 S.E.2d at 821. Discussing hearsay and the coconspirator exception, the Court of Appeals inculcated:

> Rule 801(d)(2)(E), SCRE, provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay. *See also State v. Gilchrist,* 342 S.C. 369, 371, 536 S.E.2d 868, 869 (2000) (noting that Rule 801(d)(2)(E) allows for the admission of a coconspirator's statement where there is evidence of the

---

1. Moss testified the phrase "having a lick" meant they could rob the victim. *Id.* at 516, 593 S.E.2d at 821.

conspiracy independent of the statement sought to be admitted). Here, there was evidence presented at trial that Ross and Manick conspired with [Anderson] to rob and murder the victim. The statements allegedly made to Lukie by Ross were sufficient to allow the jury to reasonably infer that the statements were made in furtherance of the conspiracy, especially in light of the fact that Lukie agreed to accompany Ross and Manick in their robbery of the victim. Accordingly, we find no error in the trial court's ruling that the statement was not hearsay.

*Id.*

In the case *sub judice,* there was evidence presented, in the form of Davis' own testimony, indicating Davis, Sims, English and Ruff had a mutual understanding and conspired to hide Anderson's body and dispose of all remaining evidence of the shooting. While Davis' testimony implies she knew nothing of Anderson's death until the statement by English, her testimony directly prior to the statement is sufficient to show she knew or should have known the scope of the conspiracy. Additionally, her conduct subsequent to English's statement proves her involvement in the conspiracy. Thus, English's statements are admissible as non-hearsay against all four individuals, including Sims. The statement was sufficient to allow a jury to reasonably infer it was made to induce enlistment, advance participation, or prompt additional action on Davis' part in furtherance of the conspiracy to hide the details of Anderson's death, especially in light of the fact Davis was already acting in collusion with English, Sims and Ruff. Consequently, we find no error in the admission of Davis' testimony.

## CONCLUSION

We rule the trial judge properly allowed one co-conspirator to testify to another co-conspirator's statement relating to appellant's own statement of guilt because the statement was calculated to induce participation in the combined and joint effort to dispose of the victim's body, the gun, and other evidence of murder. We hold the statement was *NOT* hearsay, but constituted relevant and admissible probative evi-

dence in this murder. ACCORDINGLY, the conviction and sentence of the appellant are

**AFFIRMED.**

SHORT and THOMAS, JJ., concur.