597 S.E.2d 1

The STATE, Respondent,

v.

Helen Marie DOUGLAS, Appellant.

No. 3772.

Court of Appeals of South Carolina.

Heard Dec. 10, 2003.
Decided April 5, 2004.
Withdrawn, Substituted and Refiled May 21, 2004.

Jack B. Swerling, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, all of Columbia; David Michael Pascoe, Jr. and Jonathan S. Gasser, both of Columbia, for Respondent.

CURETON, A.J.:

Helen Marie Douglas was convicted of murder and armed robbery. She received concurrent sentences of life imprisonment for murder and thirty years imprisonment for armed robbery. Douglas appeals. We affirm in part, reverse in part, and remand.

## FACTS

Douglas and her husband, Ronnie Douglas, owned two houses in Colleton County. Douglas was in the habit of staying at the river house, and Ronnie usually stayed at the house in town. On the morning of November 3, 1997, Douglas knocked on a neighbor's door across the street from the town house, explaining that something had happened to Ronnie. The neighbor called 911 and went with Douglas to the town house, which she stated appeared to be ransacked. The neighbor also testified that Ronnie's head was surrounded by blood and he did not have a pulse. Douglas and the neighbor then left the house, and the neighbor called Douglas's two sons. Police arrived at the scene and determined there was no evidence of forced entry. A treating paramedic testified that Ronnie was dead and appeared to have a gunshot wound to the head.[1]

Douglas gave two statements to police in the days following Ronnie's murder. On each occasion, officers advised Douglas of her *Miranda*[2] rights before openly tape-recording her statements. Douglas later called Investigator Stanfield, the investigating officer, and asked him to come speak to her at the river house. The officers decided to send Stanfield out to the house with a hidden tape recorder. When he met with Douglas he did not advise her of her *Miranda* rights. Though Douglas did not make any incriminating comments about Ronnie's murder, she did admit that she had lied to the police about having an extramarital affair at the time of Ronnie's death. Though finding the secret tape-recording a "very,

---

1. It was subsequently determined by the medical examiner that Ronnie had sustained five gunshot wounds to the head.

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

very, very poor practice," the trial judge allowed admission of a redacted version of the recording at trial.

Douglas's son, Ronald, testified that Douglas gave her house keys to his brother, Tony, when she was arrested. Ronald testified that he made a copy of these keys without informing either Tony or Douglas. Ronald stated he used these keys to enter the river house at least three times—once by himself and twice with his ex-wife. He said he wanted to retrieve his video camera, his daughter's clothing, and some of his father's personal possessions. During one of these searches, Ronald's ex-wife discovered a bag of .25–caliber bullets and an empty box containing a receipt for a .25–caliber pistol. Ronald took several items from the house to the police, explaining he was searching for his father's wallet. Ronald also told police that, in the course of searching the pool pump house, he cut off the lock and threw it into the creek. Investigator Stanfield stated, "we told [Ronald] if anything came up with the investigation that needed our attention, please bring it to our attention."

Approximately eighteen months after Ronnie's murder, some homeowners found a garbage bag in the creek in their backyard. Douglas's river house was located on the nearby river. The bag contained rocks and a brick. A second bag, which was within the first bag, contained surgical gloves, two shirts, and a pair of jeans. One of Douglas's daughters-in-law testified one of the shirts was Douglas's, and that the jeans were in Douglas's size. However, the only hair sample found on the clothing did not match Douglas. After these items were turned over to police, the police conducted an underwater search of the creek. Police found a cinder block used to weigh down Ronnie's wallet and a .25–caliber handgun.[3]

In further support of its theory that Douglas killed her husband, the State presented testimony from an insurance agent, Gary Wayne Walker. Walker testified that he ran into Douglas at the river house in September 1997. Walker stated Douglas was interested in purchasing a life insurance policy on Ronnie's life. Walker advised Douglas that he could not issue such a policy without Ronnie's consent. Walker later dis-

---

**3.** Forensic tests later identified the .25–caliber handgun as the murder weapon.

cussed prices with Douglas, but did not actually give her the quotes.

At the close of the State's case, Douglas moved for a directed verdict on the murder charge, arguing the State's case was purely circumstantial in nature. The trial judge denied the motion. Douglas also moved for a directed verdict on the armed robbery charge, arguing the State had not proved the essential elements of the offense. The trial judge denied the motion. The jury subsequently found Douglas guilty of both murder and armed robbery. Douglas renewed her motions for a directed verdict after the verdict was handed down. The trial judge denied these post-trial motions. The trial judge levied a life sentence on the murder charge and a concurrent sentence of thirty years imprisonment for armed robbery. Douglas appeals both of her convictions as well as her sentence for murder.

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only. We are bound by the trial court's factual findings unless they are clearly erroneous. This same standard of review applies to preliminary factual findings in determining the admissibility of certain evidence in criminal cases." *State v. Wilson*, 345 S.C. 1, 5–6, 545 S.E.2d 827, 829 (2001) (citations omitted).

## DISCUSSION

### I. Admission of Evidence

Douglas argues the trial judge erred in allowing the admission of several types of evidence. She states the following should not have been admitted at trial: (1) Walker's testimony about Douglas's interest in an insurance policy; (2) the secretly-taped statement given to Investigator Stanfield; (3) the items found by Ronald during his searches of the river house; and (4) the items found in the creek.

Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401,

SCRE. Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Rule 403, SCRE.

"The admission or exclusion of evidence is left to the sound discretion of the trial judge, whose decision will not be reversed on appeal absent an abuse of discretion." *State v. Saltz*, 346 S.C. 114, 121, 551 S.E.2d 240, 244 (2001). To warrant reversal, an appellant must show not only an alleged error, but also resulting prejudice. *State v. Thompson*, 305 S.C. 496, 502, 409 S.E.2d 420, 424 (Ct.App.1991) (stating the admission and exclusion of evidence is largely a matter of the trial judge's discretion, and the judge's rulings will not be overturned on appeal unless the judge committed a manifest abuse of discretion and the defendant suffered prejudice as a result).

## A. Insurance Testimony

Douglas contends the trial judge erred in admitting the testimony of Gary Wayne Walker. She asserts the probative value of the testimony was outweighed by the unfairly prejudicial effect.

Walker testified he had known Douglas and her husband since the early 1970's. In September of 1997, approximately two months before the murder, Walker came in contact with Douglas. He stated he was in the area near Douglas's river house looking at property when he saw Douglas near the road. Walker stopped and spoke with Douglas. During the conversation, Douglas inquired whether Walker was still employed at the fire department. Walker told Douglas he had left the fire department and gotten into the insurance business. Walker testified Douglas asked about types of insurance and, then, "from there the conversation led to she was interested in some insurance on Ronnie, asked me if I could get her a quote on some insurance, which I did." Walker acknowledged that in order to issue an insurance policy he would have needed Ronnie's permission. Walker stated that some time after this conversation he again came in contact with Douglas. At that time, Walker informed Douglas that he had the insurance quotes. Walker testified he never gave these quotes to Douglas.

■ Our Supreme Court has consistently held that evidence of a life insurance policy on the victim in a homicide case may be admissible to establish a defendant's motive. To be admissible, however, the evidence must show that the defendant would derive some benefit from the proceeds of the policy. *See, e.g., State v. Needs,* 333 S.C. 134, 150, 508 S.E.2d 857, 865 (1998) (holding evidence that defendant carried a life insurance policy on the victim may be admissible to show defendant's motive for the homicide); *State v. Williams,* 321 S.C. 327, 339, 468 S.E.2d 626, 633 (1996), *cert. denied, Williams v. South Carolina,* 519 U.S. 891, 117 S.Ct. 230, 136 L.Ed.2d 161 (1996) (finding evidence that defendant had substantially increased life insurance benefits for wife and son immediately prior to the homicides constituted some circumstantial evidence of defendant's motive); *State v. Vermillion,* 271 S.C. 99, 100, 245 S.E.2d 128, 129 (1978) (holding "it is not necessary to show that the defendant was the beneficiary under a policy of life insurance on the life of the deceased in order to render it relevant and admissible if there is some showing that the defendant would derive some benefit from the proceeds of the policy").

Here, there was no policy from which Douglas could derive some benefit. Instead, the testimony only established that Douglas inquired about a policy and never followed through with confirming the quotes and obtaining her husband's approval. Motive cannot be established through the non-purchase of an insurance policy. To hold otherwise, we would significantly extend the established precedent that requires the existence of a policy. Moreover, Douglas was clearly prejudiced by the inference that she was attempting to purchase additional insurance on her husband's life without his knowledge just prior to his death. As such, we find the judge erred in admitting Walker's testimony. Accordingly, we reverse and remand for a new trial.[4]

## B. Tape–Recorded Statement

■ Douglas argues the trial judge erred in admitting her statement that was surreptitiously recorded by Investigator Stanfield while she spoke with him at her home.

---

4. Because issues have been raised which may arise again on re-trial, we address several questions in order to aid the trial court.

During a pre-trial conference, Douglas's counsel objected to the admission of the taped statement primarily on the ground that the prejudicial value of its admission outweighed the probative value. Counsel contended the investigator believed Douglas was the only suspect and was trying to get her to confess even though she had not done so on two prior occasions when she had given statements. The judge took the motion under advisement, but indicated "the *Miranda* issue [is] a lot stronger than the one party tape issue."

At trial, Douglas's counsel again asserted Douglas was entitled to a *Miranda* warning at the time the statement was taped because she was a suspect and had been given her *Miranda* rights when she gave the earlier two statements. In response, the State argued *Miranda* was inapplicable given Douglas was not "in custody" at the time the statement was made. The judge continued the discussion, asking counsel to analyze the issue "in terms of *Miranda*" and "privacy." Ultimately, the judge allowed the tape, in a redacted form, to be played for the jury. The judge indicated he had problems with the privacy aspect, but he did not believe it rose to the level of being inadmissible. .

▮▮▮ *Miranda* warnings are required only when a suspect " 'has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *State v. Easler,* 327 S.C. 121, 127, 489 S.E.2d 617, 621 (1997) (quoting *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). "In determining whether a suspect is 'in custody,' the totality of the circumstances, including the individual's freedom to leave the scene and the purpose, place and length of the questioning must be considered." *Id.* The relevant inquiry is whether a reasonable person in the suspect's position would have believed herself to be in custody. *Id.* at 128, 489 S.E.2d at 621.

In the instant case, we find Douglas was not in custody when she was secretly tape-recorded by Investigator Stanfield. Several days after receiving *Miranda* warnings and giving two formal statements to police, Douglas called Stanfield and asked to speak with him at her river house. Stanfield testified that she stated she "needed to tell [him] something" and asked him to "come alone ." While she did not

know she was being tape-recorded, Douglas was undoubtedly aware she was speaking to the investigating officer about her husband's murder. As the conversation took place at Douglas's residence, and at her request, she was clearly in control of the conversation. Further, given the circumstances under which the conversation took place, we fail to see why Douglas would not have felt free to leave the scene. Upon examining the totality of the circumstances surrounding the tape-recording incident, it is clear—under the reasonable person standard—that Douglas would not have believed she was in police custody when she had her conversation with Stanfield. Because Douglas invited Investigator Stanfield to her home, she was not in custody and, therefore, *Miranda* would not be applicable.

Moreover, the fact that Douglas was considered a suspect or that she had previously been apprised of her *Miranda* rights is not dispositive given she was not in custody. *See State v. Neeley,* 271 S.C. 33, 41, 244 S.E.2d 522, 527 (1978) (" '[A] noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.' " (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977))); *Id.* (" 'But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.' "); *State v. Sprouse,* 325 S.C. 275, 282, 478 S.E.2d 871, 875 (Ct.App.1996) (finding the fact that an investigation focuses on the suspect does not trigger the *Miranda* warnings unless he or she is in custody).

█ Finally, we disagree with Douglas's contention that the prejudicial value of the evidence outweighed its probative effect. During the statement, Douglas repeatedly stated that she did not want her affair with Webster to get out to her sons or become public knowledge. In response, Investigator Stanfield indicated there was nothing he could do because Webster had already given a statement in which he admitted to the affair. Douglas asked Stanfield to say it was just a rumor and have the document "just disappear." Stanfield refused to help

hide the affair. Given the State's case was entirely circumstantial, the evidence was clearly probative. A jury could have inferred from the evidence that Douglas wanted Investigator Stanfield to destroy her paramour's statement, which revealed inconsistent statements she made regarding her plans the morning of the murder, her affair with Webster, as well as Ronnie's request for a divorce the night before the murder.

 In any event, regardless of whether Douglas was in custody at the time of the interrogation, any error in the failure to suppress her statement was harmless given the substance of the conversation was cumulative in nature. *See State v. Blackburn*, 271 S.C. 324, 329, 247 S.E.2d 334, 337 (1978) ("Under settled principles, the admission of improper evidence is harmless where it is merely cumulative to other evidence."). The redacted conversation that was read into evidence at trial did not contain any incriminating statements about Ronnie's murder. Rather, the conversation appeared to concern Douglas's initial denial of having engaged in an extramarital affair, and her subsequent fear that news of the affair would be made public.

Our decision should in no way be interpreted that we condone the procedure employed by law enforcement. However, given the facts of this case and the specific arguments raised on appeal, we must affirm the trial judge's decision to admit the redacted version of Douglas's tape-recorded statement into evidence.[5]

## C. Private Search and Seizure

 Douglas asserts the trial judge erred in admitting evidence that was obtained in a course of illegal searches and seizures. Specifically, Douglas contends that Ronald was acting for the State when he repeatedly searched her home.

---

5. We note at trial Douglas consistently relied on the *Miranda* argument as the basis for excluding this evidence. Although at one point Douglas mentions that "[o]ur state constitution sets a higher standard of privacy and entitlement to be free from this kind of conduct by the State," she does not argue in her brief that this evidence should be excluded based on a violation of a constitutional right to privacy.

 "[A]n analysis of whether a private citizen's search and seizure is attributable to the State requires an inquiry into the totality of the circumstances." *State v. Cohen*, 305 S.C. 432, 436, 409 S.E.2d 383, 386 (1991), *cert. denied, Cohen v. South Carolina*, 503 U.S. 942, 112 S.Ct. 1490, 117 L.Ed.2d 630 (1992). "Factors to be considered include: the citizen's motivation for the search or seizure; the degree of governmental involvement, such as advice, encouragement, knowledge about the nature of the citizen's activities, and the legality of the conduct encouraged by the police." *Id.* "The Fourth Amendment does not bar a search and seizure, even an arbitrary one, effected by a private party on his own initiative." *State v. Brockman*, 339 S.C. 57, 66, 528 S.E.2d 661, 666 (2000), *cert. denied, Brockman v. South Carolina*, 530 U.S. 1281, 120 S.Ct. 2757, 147 L.Ed.2d 1018 (2000). "It does, however, bar evidence arising from such intrusions if the private party acted as an instrument or agent of the government." *Id.* "The party challenging admission of evidence has the burden to show sufficient government involvement in the private citizen's conduct to warrant fourth amendment scrutiny." *Cohen*, 305 S.C. at 434, 409 S.E.2d at 385.

We find the evidence collected by Ronald at the river house and subsequently turned over to the police was the product of private searches. Ronald testified that he went to Douglas's river house several times for general upkeep purposes and in order to retrieve personal items, which included his video camera, his father's tools, and his daughter's clothing. Ronald's ex-wife confirmed that, on the two occasions she accompanied him to the river house, they were picking up personal possessions. When asked whether anyone told him to go out to the river house, Ronald stated he "[d]id it on [his] own." As a result of these three searches, Ronald took insurance papers, plats, deeds, and the bag containing the bullets and receipt for the .25–caliber pistol to Stanfield, the investigating officer. Stanfield testified that he told Ronald "if anything came up with the investigation that needed our attention, please bring it to our attention." In our view, the testimony provided by both Ronald and Stanfield supports the State's proposition that Ronald was not acting as an agent or instrumentality of the State when he searched Douglas's river house. It is clear that, in visiting the river house to retrieve

personal property, Ronald undertook searching his mother's house of his own accord.

Based upon both the totality of the circumstances and the *Cohen* factors, Ronald's searches of the river house were not State-endorsed and, thus, not barred by the Fourth Amendment. Therefore, the trial judge did not err in admitting items seized by Ronald from the river house.

## D. Items Found in the Creek[6]

 Douglas argues the trial judge erred in refusing to suppress the items found in the creek near her river house. She asserts the State failed to present any evidence connecting her to these items. As such, she contends the items were not relevant.

Police were informed a plastic bag containing several items was found in a local creek approximately eighteen months after Ronnie's murder. After finding the bag wedged against their dock, the homeowners opened the bag to discover it was weighted down with a brick and some rocks and contained a second bag. The inner bag contained the following: surgical gloves, two shirts, and a pair of jeans. As previously discussed, several of these items were identified as either Douglas's, or similar to an item owned by Douglas. After securing this identification, police divers went to the creek and found a sunken cinder block, with the murder weapon and Ronnie's wallet stuffed into the block's holes.

We find this evidence was relevant and properly admitted by the trial judge. The plastic bag and the cinder block were located in the same vicinity in the creek. Further, the creek was located in the same area as Douglas's river house. Though this evidence was circumstantial, it was substantial in nature. As Douglas's shirt was found in the vicinity of the murder weapon and the victim's wallet, the items found in the creek tended to increase the probability that Douglas was involved in Ronnie's murder. Thus, this evidence was clearly relevant. *See* Rule 401, SCRE (stating relevant evidence is "evidence having any tendency to make the existence of any

---

6. As Douglas does not specify whether she is challenging the items in the plastic bag or the items in the cinder block, we will address all the evidence retrieved from the creek area.

fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Accordingly, the trial judge did not err in admitting into evidence the items found in the creek near Douglas's river house.

## II. Directed verdict

### A. Murder

Douglas argues the trial judge erred in denying her motion for a directed verdict as to the murder charge. She asserts that, as the State's case was entirely circumstantial in nature, there was insufficient evidence to convict her of murder.

On an appeal from the trial judge's denial of a motion for a directed verdict, the appellate court may only reverse the trial judge if there is no evidence to support the trial judge's ruling. *State v. Gaster*, 349 S.C. 545, 555, 564 S.E.2d 87, 92 (2002). When ruling on a motion for a directed verdict in a criminal case, the trial judge is concerned with the existence or non-existence of evidence, not its weight. *State v. Morgan*, 282 S.C. 409, 411, 319 S.E.2d 335, 336 (1984). In reviewing the denial of a motion for a directed verdict, the evidence is viewed in the light most favorable to the State. *State v. Fennell*, 340 S.C. 266, 270, 531 S.E.2d 512, 514 (2000). If there is any direct evidence or substantial circumstantial evidence reasonably tending to prove the guilt of the accused, we must find the case was properly submitted to the jury. *State v. Pinckney*, 339 S.C. 346, 349, 529 S.E.2d 526, 527 (2000). "A defendant is entitled to a directed verdict when the State fails to produce evidence of the offense charged." *State v. McHoney*, 344 S.C. 85, 97, 544 S.E.2d 30, 36 (2001).

" 'Murder' is the killing of any person with malice aforethought, either express or implied." S.C.Code Ann. § 16–3–10 (2003). " 'Malice' is the wrongful intent to injure another and indicates a wicked or depraved spirit intent on doing wrong." *State v. Kelsey*, 331 S.C. 50, 62, 502 S.E.2d 63, 69 (1998).

We find the State presented substantial circumstantial evidence sufficient to allow Douglas's murder charge to go to the

jury. While the town house appeared to be ransacked, there was no evidence of forced entry. Aside from Ronnie, Douglas had the only other set of keys to the town house. Further, Douglas was the last person to see Ronnie alive, and she was the person who discovered his body before 7:00 a.m. the next morning. Douglas told police she arrived at the town house at such an early hour because she wanted to go hunting with Ronnie. However, Ronnie's brother testified that Ronnie was not going hunting that morning because the two of them were going to a car sale that day. Douglas contradicted her own statement that she and Ronnie were going hunting, as she told her paramour, Jay Webster, that she planned on working in the yard at the river house that day. Webster also testified that Douglas came to his house the night before Ronnie's murder and told him Ronnie wanted to get a divorce. Douglas repeatedly lied to police about her relationship with Webster before finally admitting they were having an extramarital affair.

Douglas's two sons each testified that Ronnie had purchased a .25–caliber pistol for Douglas's use. While Douglas told police the couple owned a .357 Magnum revolver and a .22 derringer, she did not initially mention the .25–caliber pistol. A .25–caliber pistol, along with Ronnie's wallet, was recovered from the bottom of the creek and subsequently identified as the murder weapon. A plastic bag containing surgical gloves, two shirts, and a pair of jeans was also recovered from the creek. One of Douglas's daughters-in-law identified one of the shirts as Douglas's and stated the jeans were Douglas's size. The daughter-in-law also stated the surgical gloves were similar to those used in Douglas's beauty parlor.

In sum, the evidence presented at trial constituted substantial circumstantial evidence that reasonably tended to prove Douglas's guilt. Thus, the trial judge did not err in denying the motion for a directed verdict as to the murder charge.

## B. Armed Robbery

■ Douglas argues the trial judge erred in denying her motion for a directed verdict as to the armed robbery charge. She asserts the State failed to prove the required elements of armed robbery. Specifically, she contends there was no evidence that the perpetrator took the wallet by force or intimi-

dation or that the victim was alive at the time of the taking. She further asserts there was no evidence that the taking of the wallet and the shooting occurred at the same time by the same person.

"Robbery is defined as the felonious or unlawful taking of money, goods, or other personal property of any value from the person of another or in his presence by violence or by putting such person in fear." *State v. Parker,* 351 S.C. 567, 570, 571 S.E.2d 288, 289 (2002). "Armed robbery occurs when a person commits robbery while armed with a deadly weapon." *Id.* at 570, 571 S.E.2d at 290; S.C.Code Ann. § 16–11–330(A) (2003). More specifically, "[r]obbery is the crime of larceny accomplished with force, while larceny is the 'felonious taking and carrying away of the goods of another' against the owner's will or without his consent. Thus, asportation is an element of robbery and armed robbery." *State v. Keith,* 283 S.C. 597, 598, 325 S.E.2d 325, 325–26 (1985) (quoting *State v. Brown,* 274 S.C. 48, 49, 260 S.E.2d 719, 720 (1979)) (citations omitted).

While there is no evidence the wallet was taken before Ronnie's death, it is not essential the victim in an armed robbery must be alive when the robbery occurs. However, in order to be guilty of armed robbery in conjunction with a homicide, the State must prove the victim's death and the taking are part of a continuous chain of events so interconnected as to be inseparable. *See* 67 Am.Jur.2d *Robbery* § 14 (2003) ("[A] taking from the body of one already dead is a taking 'from the person' if the death and the taking are so connected as to form a continuous chain of events."); 77 C.J.S. *Robbery* § 9 (1994) ("Although, as an abstract principle of law, one ordinarily cannot be guilty of robbery if the victim is a deceased person, this principle does not apply where a robbery and homicide are a part of the same transaction and are so interwoven with each other as to be inseparable. If the taking was made possible by an antecedent assault, the offense is robbery regardless of whether the victim died before or after the taking of the property."); *see, e.g., Jones v. State,* 652 So.2d 346, 350 (Fla.1995), *cert. denied, Jones v. Florida,* 516 U.S. 875, 116 S.Ct. 202, 133 L.Ed.2d 136 (1995) (finding violent murders and taking of victims' property were part of

continuous acts and therefore supported robbery convictions); *Oglesby v. State,* 243 Ga. 690, 256 S.E.2d 371, 374 (1979) (affirming trial judge's denial of directed verdict for armed robbery where defendant contended the taking of the victim's property did not occur until after the victim either was comatose or dead); *State v. Fields,* 315 N.C. 191, 337 S.E.2d 518, 524–25 (1985) (holding, in a case involving convictions for first-degree murder, armed robbery, felony murder, and second-degree burglary, "[a]ll that is required is that the elements of armed robbery occur under circumstances and in a timeframe that can be perceived as a single transaction"); *People v. Childs,* 161 Misc.2d 988, 615 N.Y.S.2d 972, 975 n. 3 (N.Y.Sup.Ct.1994) (discussing jurisdictions that have upheld robbery convictions concerning dead victims); *cf. State v. Damon,* 285 S.C. 125, 129, 328 S.E.2d 628, 631 (1985), *cert. denied, Damon v. South Carolina,* 474 U.S. 865, 106 S.Ct. 187, 88 L.Ed.2d 156 (1985), *overruled in part on other grounds by State v. Torrence,* 305 S.C. 45, 406 S.E.2d 315 (1991) (finding in a death penalty case that murders were committed "while in the commission of" armed robbery or larceny with the use of a deadly weapon where property belonging to the deceased individuals was stolen in a continuous sequence of criminal acts at the time of the murders).

We find the State presented sufficient evidence to support the armed robbery charge. Ronnie was shot five times in the head. His house appeared to be ransacked and his wallet was missing. The wallet was found in the bottom of the creek with the murder weapon and in the same vicinity as the items identified as belonging to Douglas. Furthermore, given the violent nature of Ronnie's death, it could be inferred that the force used to commit the homicide also facilitated the taking. Thus, there is substantial circumstantial evidence that Ronnie's murder and the taking of the property were part of a single transaction or continuous sequence of events.

Viewing the evidence in the light most favorable to the State, as we are required to do, the evidence reasonably tends to prove Douglas's guilt. Accordingly, the trial judge properly submitted the armed robbery charge to the jury.

### III. Sentencing

Douglas argues the trial judge erred in levying the sentence of life imprisonment for her murder conviction. She

states the trial judge made an incorrect statement of law when discussing sentencing options.

During sentencing the trial judge stated, "the sentence of the Court with regard to murder, and I will tell the open courtroom there is [sic] only two choices. It's either thirty years or life, period." While Douglas argues this phrasing omits the option of levying a sentence of less than thirty years imprisonment, there was no contemporaneous objection at trial. As such, this issue is not preserved for our review. *See State v. Johnston,* 333 S.C. 459, 462, 510 S.E.2d 423, 424 (1999) (holding an objection to a sentence exceeding the maximum allowable by law does not raise a question of subject matter jurisdiction and cannot be raised for the first time on appeal); *State v. Garner,* 304 S.C. 220, 222, 403 S.E.2d 631, 632 (1991) (stating failure to object to sentence at time of its imposition constitutes a waiver of the issue on appeal); *State v. Shumate,* 276 S.C. 46, 47, 275 S.E.2d 288, 288 (1981) (finding defendant's failure to timely object to or seek modification of his sentence in the trial court precludes him or her from presenting an objection for the first time on appeal).

## IV. Motion for a New Trial

Douglas argues the trial judge erred in denying her motion for a new trial. She claims the circumstantial nature of the State's case, coupled with the cumulative effect of the admission of several items into evidence, was highly prejudicial.

We reverse the trial judge's decision to admit testimony concerning Douglas's inquiry about insurance on her husband. Because we remand for a new trial as to the charge of murder and because the charge of armed robbery is so closely intertwined, we also remand for a new trial on the armed robbery charge.

## CONCLUSION

We reverse the trial judge's decision to admit the testimony concerning insurance. We affirm the judge's denial of Douglas's motion for a directed verdict as to the charges of murder and armed robbery, but for the reasons noted above, remand for a new trial on both charges. Because Douglas's remaining

issues may arise during the next trial, we affirm the judge's decision to admit the following: (1) the tape-recorded statement; (2) the evidence procured through private searches; and (3) the items found in the creek.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

ANDERSON, J., concurs and GOOLSBY, J., dissents in part and concurs in part in a separate opinion.

GOOLSBY, J. (dissenting in part and concurring in part):

I respectfully dissent from that portion of Judge Cureton's opinion that holds the admission of insurance agent Gary Wayne Walker's testimony of his discussion with the defendant about her obtaining a quote on life insurance for her husband constituted reversible error. I also dissent from that portion of Judge Cureton's opinion that reverses the defendant's convictions for murder and for armed robbery because of the admission of this evidence. In view of the other evidence against the defendant, I regard any error in the admission of the evidence of an inquiry about an insurance quote as "harmless beyond a reasonable doubt." *See State v. Tench*, 353 S.C. 531, 536, 579 S.E.2d 314, 317 (2003) (admission of challenged evidence deemed harmless). Moreover, I simply fail to see how her inquiring about the purchase of insurance on her husband proves anything, particularly when the evidence does not show the defendant actually bought the insurance or otherwise benefited from it.

I otherwise concur in Judge Cureton's opinion and would affirm the defendant's sentences and convictions.