632 S.E.2d 845

**The STATE, Petitioner,**

v.

**Helen Marie DOUGLAS, Respondent.**

No. 26167.

Supreme Court of South Carolina.

Heard April 18, 2006.

Decided June 19, 2006.

Rehearing Denied Aug. 11, 2006.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Solicitor David M. Pascoe, all of Columbia, for Petitioner.

Jack B. Swerling, of Columbia, for Respondent.

Justice BURNETT.

Helen Marie Douglas (Respondent) was convicted of the murder and armed robbery of her husband, Rufus "Ronnie" Douglas (the victim). The Court of Appeals reversed the convictions and remanded the case for a new trial. *State v. Douglas,* 359 S.C. 187, 597 S.E.2d 1 (Ct.App.2004). We granted the State's writ of certiorari. We affirm in part and reverse in part.

## FACTUAL AND PROCEDURAL BACKGROUND

Respondent and the victim owned two houses in Colleton County. Generally, the victim stayed at their home in the town of Walterboro (town house) and Respondent stayed at their house on Chessee Creek (river house). Before 7 a.m. on November 4, 1997, Respondent discovered the victim's body in a bedroom in the town house. An autopsy revealed the victim had been shot five times in the head, including three fatal shots.

Police investigators testified the town house appeared ransacked, but there were no signs of a forced entry and nothing was broken. The only item missing was the victim's wallet. Investigators found five spent shell casings from a .25–caliber pistol on the victim's bedroom floor.

According to Respondent, she ate dinner and watched a movie with the victim on November 3. The victim stayed at the town house and Respondent stayed at the river house that night. Respondent originally asserted she did not leave the river house until she went to breakfast at 6 a.m. on November 4. She asserted she went to the town house at 6:50 a.m. to go hunting with the victim. Respondent eventually told police the victim had said during dinner on November 3 he wanted to file for divorce. She also admitted to police she was having an affair, but she denied having any marital problems.

Testimony at trial revealed the victim had plans to go to a car auction with his brother in Ravenel the morning of November 4. Family members also testified Respondent generally did not hunt, and when the victim did hunt, he would go with his grandson.

According to Respondent's boyfriend, she came to his house about 3:30 a.m. on November 4 and stayed until 5 a.m. She told him the victim had brought up divorce during dinner that night and she was worried because her beauty shop was in the back of the town house. Respondent also told her boyfriend that she planned to work in the yard at the river house on November 4.

Respondent told police the victim owned a .357 Magnum revolver and she owned a .22–caliber derringer. Respondent admitted the couple owned a .25–caliber pistol when she was

specifically asked by police about the gun. Her sons testified Respondent possessed the couple's .25–caliber pistol, and Respondent told police she had returned the pistol to the victim. Respondent also told police she saw the .25–caliber pistol on the victim's bedside nightstand the Sunday before the murder.

Respondent gave her son, Tony, the keys to the river house after her arrest. Ronald, the couple's other son, made a copy of the keys and made at least three trips to the river house between March and April 1998. During one visit to the river house, Ronald's ex-wife found a bag with .25–caliber bullets and a box with a receipt for a .25–caliber pistol in a bedroom closet. Ronald turned these items over to the police.

In April 1999, homeowners near the river house discovered a garbage bag in the creek behind their house. The bag contained another garbage bag, rocks, and a brick. The second bag contained five surgical gloves, two shirts, and a pair of jeans. One of Respondent's daughters-in-law identified the shirts as belonging to Respondent, the jeans as Respondent's size, and the gloves as similar to those Respondent used at her beauty shop. The only hair sample found on the clothing could not be identified.

Police also discovered a cinder block in a search of the creek. A .25–caliber pistol, the victim's wallet, and socks were found inside the cinder block. The pistol was identified as the murder weapon through forensic testing.

The State presented testimony from Eric Creech and Gary Wayne Walker to support its theory that Respondent murdered her husband. During July 1997, Respondent told Creech, who did carpentry work for her, she had a rocky relationship with the victim and they hated each other. When Creech asked Respondent why she did not get out of the marriage, Respondent replied she was scared she might lose some benefits or retirement, but she would stay married.

Walker testified he had been an acquaintance of the Douglases since the 1970s. One day in September 1997, he saw Respondent by the mailbox at the river house and stopped to talk. He told Respondent he had a new job as an insurance agent and Respondent asked him about several types of insurance. She then told him she was interested in life insurance on the victim and asked Walker to provide her with

quotes. Walker testified he saw Respondent at a later date and mentioned the quotes to her, but he never gave any actual quotes to Respondent.

The State introduced evidence that Respondent was the beneficiary of two life insurance policies on the victim. Respondent was the beneficiary of the victim's federal retirement benefits. After the victim's death, Respondent submitted claims to receive the benefits under the life insurance policies and the victim's retirement account.

The jury found Respondent guilty of murder and armed robbery. The trial judge sentenced Respondent to life imprisonment for the murder charge and thirty years' imprisonment for the armed robbery charge, to be served concurrently.

The Court of Appeals affirmed the trial court's denial of Respondent's motion for directed verdict. The Court of Appeals further found, however, that the trial court abused its discretion by admitting testimony that Respondent inquired about life insurance on the victim about two months before the murder. The Court of Appeals reversed and granted Respondent a new trial. *Douglas,* 359 S.C. at 196–97, 203–06, 597 S.E.2d at 5–6, 9–11.

## ISSUES

I. Did the Court of Appeals err in finding the trial court abused its discretion by admitting testimony that Respondent casually inquired about obtaining a life insurance policy on the victim two months before his death?

II. Did the Court of Appeals err in concluding the admission of the testimony was not harmless error?

## STANDARD OF REVIEW

The admission or exclusion of evidence is a matter addressed to the sound discretion of the trial court and its ruling will not be disturbed in the absence of a manifest abuse of discretion accompanied by probable prejudice. *State v. Gaster,* 349 S.C. 545, 557, 564 S.E.2d 87, 93 (2002); *State v. Frank,* 262 S.C. 526, 533, 205 S.E.2d 827, 830 (1974). An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an

430

error of law. *State v. McDonald*, 343 S.C. 319, 325, 540 S.E.2d 464, 467 (2000); *State v. Manning*, 329 S.C. 1, 7, 495 S.E.2d 191, 194 (1997).

## LAW AND ANALYSIS

### I. Admission of Testimony

 The State argues the Court of Appeals erred in reversing the trial court's decision to admit testimony from Gary Walker that Respondent inquired about life insurance on the victim approximately two months before the murder. We disagree.

All relevant evidence is admissible. Rule 402, SCRE; *State v. Saltz*, 346 S.C. 114, 127, 551 S.E.2d 240, 247 (2001). Relevant evidence may be excluded where its probative value is substantially outweighed by the danger of unfair prejudice. Rule 403, SCRE; *State v. Alexander*, 303 S.C. 377, 382, 401 S.E.2d 146, 149 (1991).

 Evidence of insurance is properly admitted when it tends to establish motive. *State v. Beckham*, 334 S.C. 302, 311, 513 S.E.2d 606, 610 (1999); *see also State v. Williams*, 321 S.C. 327, 332–33, 468 S.E.2d 626, 629–30 (1996) (evidence that a month before the murder of his wife and son defendant had substantially increased life insurance benefits for them and made himself the beneficiary was some circumstantial evidence of defendant's motive). Generally, evidence of a life insurance policy is properly admitted when there is evidence of the defendant's knowledge of the policy's existence, its validity, or believed validity, and that the defendant will benefit from it. *Beckham*, 334 S.C. at 311, 513 S.E.2d at 610 (citing *State v. Cole*, 54 Wash.App. 93, 772 P.2d 531 (1989)). Our precedent does not necessarily require the existence of a policy, but does require "some showing that the defendant would derive some benefit from the proceeds of the policy" to be admissible. *State v. Vermillion*, 271 S.C. 99, 100, 245 S.E.2d 128, 129 (1978); *see, e.g., State v. Thomas*, 159 S.C. 76, 80–81, 156 S.E. 169, 170–71 (1930) (applications for insurance on the life of a boy by his reputed father, which were refused and on which no policies were issued, were held to be admissible as motive in the prosecution of the father for murdering

the boy because they tended to show he tried to obtain an even greater amount of insurance on the life of the deceased than that which he actually procured).

At trial, defense counsel objected to Walker's testimony as unfairly prejudicial under Rule 403, SCRE. The trial court overruled the objection and allowed the testimony.

The Court of Appeals concluded the trial court abused its discretion by admitting Walker's testimony. The Court of Appeals discerned the testimony was not admissible because there was no policy from which Respondent could have received a benefit. The Court of Appeals also found Respondent was prejudiced by the inference that she attempted to purchase life insurance on the victim without his knowledge. *Douglas,* 359 S.C. at 197, 597 S.E.2d at 6.

Respondent's inquiry to Walker about life insurance on the victim had only slight probative value because Respondent never received a quote on the premiums, applied for, or purchased life insurance on the victim. Without the existence of an application for a life insurance policy or the issuance of a policy, the evidence presented at trial does not show how Respondent would derive some benefit from the policy's proceeds. Respondent's sole inquiry during a casual conversation does not establish motive, planning, or intent.

Moreover, the record reveals Walker did not inform Respondent she would be required to obtain the victim's permission to purchase the life insurance on him. Walker testified generally that one spouse is required to obtain the other spouse's permission to be named as a beneficiary under a life insurance policy on the other spouse's life. The prejudicial effect of this testimony was the inference that Respondent decided not to purchase the life insurance on the victim because she needed the victim's permission. The slight probative value of Walker's testimony did not substantially outweigh the unfair prejudice to Respondent, and the trial court abused its discretion by admitting the testimony.

## II. Harmless Error

The State further contends if the trial court improperly admitted Walker's testimony, the Court of Appeals erred in finding the error was not harmless. We agree.

 Generally, appellate courts will not set aside convictions due to insubstantial errors not affecting the result. *State v. Sherard*, 303 S.C. 172, 176, 399 S.E.2d 595, 597 (1991). In determining whether an error is harmless, the reviewing court must review the entire record to determine what effect the error had on the verdict. *State v. Mizzell*, 349 S.C. 326, 334, 563 S.E.2d 315, 319 (2002). Error is harmless beyond a reasonable doubt where it did not contribute to the verdict obtained. *Arnold v. State*, 309 S.C. 157, 172, 420 S.E.2d 834, 842 (1992). Thus, an insubstantial error not affecting the result of the trial is harmless where "guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached." *State v. Bailey*, 298 S.C. 1, 5, 377 S.E.2d 581, 584 (1989).

The police investigation revealed the town house had not been forcibly entered and Respondent was the only person, other than the victim, with a key to the house. Respondent was the last person to see the victim alive and was the first person to discover he had been murdered. Respondent told police she went to the river house on November 4 because she had plans to go hunting with the victim. Yet, she told her boyfriend she planned to do yard work at the river house that day and did not intend to go into town. Testimony at trial revealed the victim had plans to go to a car auction that morning. Also, the evidence revealed Respondent was not known to hunt, and if the victim hunted, he went with his grandson; not Respondent.

The night of the victim's murder, he told Respondent he wanted a divorce. Respondent told police that after returning from dinner with the victim, she did not leave the river house until the next morning when she left for breakfast. However, Respondent's boyfriend told police she visited him in the early morning hours of November 4. During this visit, Respondent told her boyfriend that the victim wanted a divorce and she was worried about her business if a divorce occurred. Also, Respondent had previously told Creech she hated the victim and she would not divorce him because she did not want to lose her benefits.

Respondent regularly possessed the couple's .25–caliber pistol, and the murder weapon was a .25–caliber pistol. The murder weapon and the victim's wallet were found in the

creek behind Respondent's river house. Respondent's clothing was found in the creek near the location of the murder weapon and the victim's wallet. Further, two bullets fired into the victim originated from the same source or same melt of lead as several of the bullets found in the box of ammunition in Respondent's closet. Moreover, the admission of Respondent's inquiry about life insurance was an insubstantial error given that the State sought to establish motive through the proper admission of two life insurance policies and the victim's retirement benefits from which Respondent would benefit. The trial court's erroneous admission of Walker's testimony did not contribute to the verdict obtained and was harmless beyond a reasonable doubt.

## CONCLUSION

We affirm the Court of Appeals' finding that the trial court abused its discretion by admitting Walker's testimony, but we reverse the Court of Appeals' finding that this was reversible error. The error was harmless and we uphold Respondent's convictions.

**AFFIRMED IN PART; REVERSED IN PART.**

TOAL, C.J., MOORE, WALLER and PLEICONES, JJ., concur.