**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

The State, Respondent,

v.

Measha Jaquetta Shawnic Joyner, Appellant.

Appellate Case No. 2024-000274

———————

Appeal From Florence County
H. Steven DeBerry, IV, Circuit Court Judge

———————

Unpublished Opinion No. 2026-UP-302
Heard May 14, 2026 – Filed June 17, 2026

———————

**AFFIRMED**

———————

Appellate Defender Sarah Elizabeth Shipe, of Columbia,
for Appellant.

Attorney General Alan McCrory Wilson and Assistant
Attorney General Brian Hollis Gibbs, both of Columbia,
and Solicitor Edgar Lewis Clements, III, of Florence, all
for Respondent.

———————

**PER CURIAM:** Measha Joyner appeals her convictions for voluntary manslaughter and possession of a weapon during the commission of a violent crime, arguing the circuit court erred in (1) denying her request to charge the jury

on self-defense and (2) denying her request for credit for time served on monitored home detention.  We affirm.

**Factual and Procedural Background**

In March 2019, a large group gathered at the Coit Street Quick Stop in Florence to celebrate the birthdays of Carlos "Stew" Jackson and Gloria Whitehead.  A fight broke out between four attendees: Measha Joyner was fighting with Deandra Whitehead while Joyner's sister, Jolica (JoJo) Joyner, fought with Kanisha Allen.  When Stew Jackson learned of the fighting, he went outside and fired a shot into the air to break up the crowd.  After bystanders pulled Allen and JoJo apart, Allen and Deandra left.  Deandra estimated that about five minutes elapsed between Jackson firing the shot in the air and their departure.

Gloria testified that she broke up the fight between her daughter, Deandra, and Joyner; she then walked Joyner to a white car and put her in the backseat.  People warned Gloria that Joyner was armed, but she explained she was trying to de-escalate the situation and Joyner had been peaceful with her.  Gloria testified that when Jackson shot into the air, JoJo and Allen were still grabbing each other's hair.  At that point, Joyner was already in the white car.  Gloria told her to stay there and went to get JoJo, but JoJo "continued to keep talking" while everyone was telling her to leave.

According to Gloria, when Chelsea Plowden (Victim) exited the building, she stopped to ask why people were fighting, and a bullet struck her in the head.  Gloria saw Joyner shooting a gun from the back passenger window of the white car as it was leaving.  Gloria did not see anyone firing at Joyner but noted everyone was scattering.  She did not see anyone other than Joyner with a gun.  Gloria admitted she was mistaken in initially identifying JoJo as the shooter but explained she was in shock, confused about names, and trying to tell people that JoJo's sister shot Victim.  Eyewitness accounts varied as to how much time passed between Jackson's shooting into the air and Joyner's shooting from the exiting car, with reports of as little as one minute up to thirty minutes.

Deandra testified that "words were exchanged" at the party, and she and Allen began fighting with Joyner and JoJo.  Gloria grabbed Deandra's hoodie, told her to stop fighting, and then escorted Joyner to her car while JoJo and Allen continued to fight.  After Jackson fired his shot in the air, Deandra and Allen left.  She learned Victim had been shot about twenty minutes later.  Deandra admitted Gloria

initially told her JoJo shot Victim but explained that Gloria did not know Joyner or her name.

Allen testified that she and Deandra had an issue with the Joyner sisters prior to their arrival and noted there were a "whole bunch of stare downs" at the party. Allen and Deandra stayed outside because they knew there would be tension, but when Joyner and JoJo walked past them, they exchanged words. The women fought for three or four minutes, and Allen heard people telling them to stop. She also heard Jackson fire the shot into the air but was initially unable to separate from JoJo. Once the two were separated, Allen and Deandra returned to her truck and left the party.

Tanisha Timmons attended the party with JoJo and Joyner. She testified that as they were leaving, some people grabbed the Joyner sisters. Timmons claimed she pulled Joyner away from the fight and heard gunshots as she was putting her in the backseat of her car. She ran to get JoJo, put her in the car, and the trio left. As Timmons was driving away, she heard gunshots coming from her backseat. Timmons did not see Joyner shooting, but she heard the shots coming from the backseat of her car.

Angela Robinson testified that she witnessed the fighting between the women at the party. Angela was unaware of any problems at the party before the Joyner sisters arrived. Angela and her daughter, Brianna, had returned to Angela's car to talk when they heard yelling and saw JoJo, Joyner, and another woman in a white car. She testified, "Measha Joyner is in the backseat with her body halfway hanging out with her arm outstretched with a gun firing into a crowd of people." Angela's son, Jamares, fired back at the car.

Jamares witnessed the fighting and noted everyone scattered when Jackson shot into the air. Jameres next heard three gunshots—he also saw someone hanging out of the window of a white car and saw a flash. He drew his .9 mm, ran after the car, and shot back at it. After the white car was gone, he heard someone screaming that Victim had been shot.

Stew Jackson recalled that "everything was fine" until JoJo and Joyner arrived. Jackson walked outside because he heard fighting, shot once in the air, and returned inside as people dispersed and walked to their cars. He then heard multiple shots and tried to go back outside, but people were rushing back into the building. Jackson believed a minute elapsed between his shot into the air and the shots he heard outside.

Corporal Thomas Herman of the City of Florence Police Department was nearby and heard the shooting. He responded and secured the Quick Stop scene, which he described as "very chaotic"—with a lot people screaming and yelling and "just going all over the place." He found Victim on the ground with a gunshot wound to the head. Another officer rendered medical aid while Corporal Herman collected witness statements. An officer trainee, Shields, spoke with Jamie Zimmerman, who shared her opinion that Victim was shot by someone from the parking lot during the crossfire with the people leaving in the white car.

Chad Smith of the South Carolina Law Enforcement Division (SLED) testified as to his examination of the firearms evidence. Because the projectile he received was damaged, he could not identify the specific caliber of the weapon, but he was able to narrow the class down to a nominal .38, which includes "a handful of different calibers," such as a .9mm, .380 auto, and .357.

SLED ultimately determined one .40 caliber casing matched the gun Stew Jackson surrendered. Three .9 mm casings matched the pistol Jamares Robinson surrendered. Three .380 casings and three .380 bullets matched the Hi-Point surrendered by Demarcus Bluett. Officers also recovered eight .9mm casings that did not match any of the guns provided by the partygoers. These casings were of aluminum construction like the Federal brand .9mm Luger ammunition seized during a search of Joyner's home. They also shared the same head stamps. Smith testified that the projectile recovered from Victim was not fired by the weapons surrendered by Jackson, Jamares, or Bluett.

The State dismissed three attempted murder charges at the close of its case. During her own case, Joyner introduced several body camera videos, including Defense Exhibit 8, which included the on-scene conversation between law enforcement and Jamie Zimmerman in the minutes after Victim was shot.

Ultimately, the jury acquitted Joyner of murder but found her guilty of voluntary manslaughter and the weapon possession charge. During sentencing, Joyner requested credit for three years served on home confinement with electronic monitoring. The State objected, noting that while Joyner was out on bond, she was charged with trafficking narcotics in Richland County. The State acknowledged that this charge was later dismissed, but argued the arrest demonstrated Joyner was not at home and that wearing an ankle monitor "didn't slow her down." The circuit court sentenced Joyner to twenty-five years' imprisonment for voluntary manslaughter and five years on the gun charge. Joyner received credit for twenty

months of pretrial confinement, but the circuit court denied her request for credit for the time served on home detention.

## Analysis

"In criminal cases, appellate courts sit to review errors of law only." *State v. Cross*, 427 S.C. 465, 473, 832 S.E.2d 281, 285 (2019). "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." *Id.* (quoting *State v. Douglas*, 369 S.C. 424, 429-30, 632 S.E.2d 845, 848 (2006)).

## I. Self-Defense

Joyner argues she was entitled to a self-defense charge due to the existence of evidence that she did not start the shooting. She contends Zimmerman's statement on the night of the shooting that she believed Victim's friends shot first and Victim was hit in the crossfire provided sufficient evidence for this requested instruction. She further asserts that the only potential evidence that she was at fault in bringing on the difficulty was her earlier fight with Deandra, who left the scene before Victim was shot. Joyner argues the circuit court's charge on the defense of necessity was functionally a charge on self-defense but problematically shifted the burden to Joyner to prove necessity while the State would have been required to disprove self-defense beyond a reasonable doubt. We disagree.

"The law to be charged must be determined from the evidence presented at trial." *State v. Cole*, 338 S.C. 97, 101, 525 S.E.2d 511, 512 (2000).

> A person is justified in using deadly force in self-defense when:
>
> (1) The defendant was without fault in bringing on the difficulty;
>
> (2) The defendant . . . actually believed he was in imminent danger of losing his life or sustaining serious bodily injury, or he actually was in such imminent danger;
>
> (3) If the defense is based upon the defendant's actual belief of imminent danger, a reasonable prudent man of

ordinary firmness and courage would have entertained the same belief . . . ; and

(4) The defendant had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did in this particular instance.

*State v. Dickey*, 394 S.C. 491, 499, 716 S.E.2d 97, 101 (2011) (quoting *State v. Wiggins*, 330 S.C. 538, 545, 500 S.E.2d 489, 493 (1998)).

During the charge conference, Joyner asked about "the appropriateness of any kind of justification charge" because if someone's firing at you, "you have the right to fire back." The State responded, "I think that's tantamount to self-defense and I don't think there's been any evidence other than an offhand comment made on a body-worn camera to support that, so I would oppose any justification charge or anything of the like." Joyner properly replied that this was not an offhand comment but a statement from an eyewitness that there was a shootout, and the witness believed Victim's friends shot first. The State noted it had never heard of such a justification charge, only self-defense, the elements of which had not been met.

The circuit court "determined that the charge of necessity is probably—is proper in this case if you all want to take a look at that. I don't find that it's a self defense case. Self defense has not been alleged in this case."

We find the circuit court properly exercised its discretion in declining to charge self-defense because Joyner failed to present evidence of at least one element required to support such an instruction. *See State v. Santiago*, 370 S.C. 153, 161, 634 S.E.2d 23, 28 (Ct. App. 2006) (finding the circuit court did not err in refusing to charge self-defense when there was "the absence of at least one element of self-defense"). Notably, we see no evidence in this record that Joyner was ever in imminent danger—or believed she was—because she was shooting from the backseat of a vehicle that was already driving away from the party when the later shots were fired. Several witnesses testified as to Jackson's shot into the air to disperse the fighting in the parking lot, but eyewitness accounts varied as to how much time elapsed between Jackson's shot and when Joyner began shooting into the crowd from the white car. However, Jamares, Gloria, and Timmons all testified that no one was shooting at Joyner when she began shooting from the backseat.

We acknowledge Zimmerman's statements to police in the body camera footage arguably provided evidence of *some* elements of self-defense.  Zimmerman explained that she did not know whose bullet struck Victim because people were shooting back and forth.  She believed someone near Victim shot her based on where the bullet hit Victim's head and her opinion that the other people were "basically shooting in the air."  She opined Victim's "friends started shooting first before the other people started shooting."  According to Zimmerman, a man driving a Mercedes went to a car to get his gun and said, "I'll light this bitch up" before shooting in the direction of the exiting car.  Zimmerman believed this man was one of Victim's friends.

Investigator Herman addressed Zimmerman's statements caught on Trainee Shields's body camera.  He read the following from his notes:

> Woman asked to speak to Officer Shields saying that
> would be Jamie Zimmerman. And she said she believe[d]
> the victim was caught in the crossfire and that she stated
> [she] believes that she was shot by the one in the parking
> lot not the one shooting from the car.

We agree with the circuit court that neither the testimony at trial nor Zimmerman's statements on the bodycam footage suggested Joyner acted in fear for her life or that a reasonable person of ordinary firmness would have entertained the same belief.  But even if there were some hint of evidence that Joyner reasonably believed she was in imminent danger, we see no evidence that she lacked the ability to avoid such alleged danger while "in the backseat with her body halfway hanging out with her arm outstretched" firing into the crowd as Timmons's car left the scene.  In sum, because evidence was not presented to satisfy all necessary elements of self-defense, the circuit court properly declined to give the requested instruction.

## II.  Credit for Time Served while on Home Detention

Section 24-13-40 of the South Carolina Code (2025) provides, in pertinent part:

> In every case in computing the time served by a prisoner,
> full credit against the sentence must be given for time
> served prior to trial and sentencing, and may be given for
> any time spent under monitored house arrest.

In denying Joyner's request for this credit, the circuit court noted it considered the report from the monitoring company indicating Joyner had no violations. The court also referenced Joyner's arrest in another county while on monitored house arrest but acknowledged the charge stemming from this arrest was later dismissed. The circuit court concluded, "After taking all of this information into consideration and having presided over the trial, and in light of the sentence I imposed, I respectfully deny the motion. . . ." for credit for time served on monitored home confinement.

We find the circuit court properly exercised its discretion in refusing to credit Joyner for time served on monitored house arrest because section 24-13-40 specifically provides the circuit court *may* award such credit, while requiring credit for time served in pretrial detention. For these reasons, Joyner's convictions and sentences are

**AFFIRMED.**

**THOMAS, MCDONALD, and TURNER, JJ. concur.**