727 S.E.2d 740

**The STATE, Respondent,**

v.

**Kathy SALLEY, Appellant.**

**No. 27135.**

Supreme Court of South Carolina.

Heard Feb. 22, 2012.

Decided June 20, 2012.

Allen Mattison Bogan, of Nelson Mullins Riley & Scarborough, and Chief Appellate Defender Robert M. Dudek, both of Columbia, for Appellant.

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, and Senior Assistant Attorney General Harold M. Coombs Jr., all of Columbia, and Solicitor James Strom Thurmond Jr., of Aiken, for Respondent.

Chief Justice TOAL.

Kathy Salley (Appellant) was found guilty of homicide by child abuse under section 16–3–85 of the South Carolina Code, S.C.Code Ann. § 16–3–85 (2003), and sentenced to twenty years' imprisonment, suspendable upon the service of eight

years. Appellant claims the circuit judge committed reversible error by allowing into evidence a photograph of the child taken while she was alive and well, and two pieces of wood found at the home of the child. Although we believe that the admission of the pieces of wood was an abuse of discretion, we nevertheless find the error to be harmless. Accordingly, we affirm Appellant's conviction.

### FACTS/PROCEDURAL BACKGROUND

On Thursday, June 23, 2005, Appellant arrived at the Aiken Regional Medical Center's emergency room at approximately 3:00 p.m. carrying a lifeless Chaquise Gregory (child) in her arms. Although the emergency room personnel attempted to revive her, it was apparent the child had been dead for some time. The child's body temperature was too low to register on a thermometer, rigor had set in at her jaw and right arm, and decomposition had begun in the lower right quadrant of her abdomen. The child had surface level abrasions on both buttocks, a bruise on her right forearm, and an injury to her lip. Several witnesses who were present at the hospital testified that one of the abrasions was scabbed over and looked to be more advanced than the other.[1] The child was six years old at the time of death.

Officers with the Aiken Department of Public Safety arrived at the hospital and obtained consent to search Appellant's home. At Appellant's home, on the floor next to the only bed in the house, officers confiscated a pair of children's jeans, underwear, a shirt, and socks. The back of the jeans and the underwear, which appeared to have been taken off as a unit, had blood stains on the right and left sides, consistent with the abrasions observed on the child's buttocks at the hospital.[2] The stains were visible on both the interior and exterior of the jeans. These items had a strong odor of urine. In a laundry basket, officers confiscated a pair of children's underwear, a child-sized undershirt, and a green towel, each appearing to

---

1. The pathologist who conducted the autopsy, Dr. Joel Sexton, testified that one wound appeared to be older than the other simply because the abrasions on one side were deeper than the other.

2. The shirt and socks found on the side of the bed did not have blood on them.

have blood on them. Officers additionally confiscated a toilet seat that appeared to have blood on it. Finally, officers took two pieces of wood with staples protruding from them that appeared to have come off a piece of furniture in the house and were lying atop a rollaway trashcan outside of Appellant's residence. The shorts the child wore to the hospital also had blood stains on the inside rear area (not bleeding through) consistent with the abrasions on the child's buttocks. An investigating officer testified that the shorts were considerably less stained than the jeans found on the side of the bed. DNA testing performed on samples from each of these items confirmed that the blood belonged to the child. Additionally, officers searched the home of Appellant's ex-boyfriend whom she referred to as her father, Joseph Oliphant, where the child occasionally stayed, and confiscated a pair of children's sized underwear with a trace amount of blood in them. The amount of blood in this underwear was insufficient to recover a DNA profile.

The pathologist who performed the autopsy on the child, Dr. Joel Sexton, testified that in addition to the surface level abrasions visible on the child's buttocks, he found underneath that skin a large hematoma, where a cup to a cup and a half of blood had pooled. This internal bleeding was not apparent to the naked eye. Dr. Sexton stated repeatedly that, under ordinary circumstances, the blood loss caused by this hematoma would not have been fatal. However, the child had an undiagnosed sickle cell trait, and the blood loss triggered a "sickle cell crisis," which led to her death.[3] Specifically, Dr.

---

3. When a person has a sickle cell trait, the loss of oxygen to the blood can trigger a sickle cell crisis. Loss of oxygen to the blood can occur from blood loss, over-exertion and dehydration, or vomiting. The loss of oxygen causes otherwise normally shaped red blood cells to become larger and crescent shaped. The shape and size of these cells causes "log-jamming" in the capillaries, technically referred to as conglutination, and the tissue downstream in the capillaries is deprived of the oxygen carried within these cells. This causes a domino effect where the red blood cells in the oxygen-deprived tissue then become similarly crescent shaped. If not treated, the process continues until the organs shut down. Most people with sickle cell trait are unaware they have it unless they experience a loss of oxygen to the blood which induces a sickle cell crisis. Dr. Sexton testified that children are not routinely tested for sickle cell trait. The symptoms of a sickle cell crisis are vomiting, abdominal pain, and general feelings of discomfort. He

Sexton testified, "The beating caused hemorrhage in the tissue which decreased the fluid volume of the blood throughout the body which led to the sickle-cell crisis." Dr. Sexton made clear that "the amount of blood that was lost by [the child] was caused by the beating, not by the sickle-cell trait."

Dr. Sexton testified that the hematoma resulted from the child being hit with an object of sufficient weight to cause the internal hemorrhage and with a rough surface to cause the skin abrasions. Based on the varied planes of linear abrasions found on the child, Dr. Sexton estimated the child was struck with a rough object between three and four times. While he was inclined to believe the blows were made to the bare skin, he stated that with enough force, skin can become abraded even with clothing on. Finally, Dr. Sexton testified to a reasonable degree of medical certainty that the cause of the child's death was homicide, or death "at the hands of another." Aside from the conglutination, "she had clear lungs and all of her organ tissues looked normal."

Based on the extent to which the child's food was digested, the decomposition that had begun in her abdomen, and the absence of urine in the bladder, Dr. Sexton estimated the child died at least 12 hours before presenting at the hospital at 3:00 p.m. Specifically, he stated the child would have died no sooner than 8:00 p.m. the evening before, and no later than 1:00 or 2:00 a.m. on the morning of June 23rd. Based on the phase of the child's inflammatory reaction to her injuries, Dr. Sexton estimated the child received those injuries approximately 12 hours before her death—anywhere from 8 a.m. to 2:00 p.m. on Wednesday, June 22nd.

On cross-examination, Dr. Sexton stated that it is possible "the child could have been struck with a hand some time after this injury and that might have triggered excessive bleeding since the trauma would have already occurred to the vessels from the strike." However, he stated, "I wouldn't—I normally wouldn't expect a hand—I have never in my career seen a person spanked with their hand and caused this kind of injury."

---

stated that a person presenting at the emergency room with these symptoms would not necessarily be tested for the presence of the sickle cell gene. Dr. Sexton has performed over 8,000 autopsies and has seen only 15 to 20 cases of death by sickle cell crisis.

Appellant made three separate statements to the police and additionally testified at trial. For the most part, her testimony contained only minor inconsistencies. Appellant was not the natural mother of the child, but had cared for the child for two and a half years after the child's mother, Appellant's niece, could no longer take care of the child. At the time of the child's death, Kenneth Buckmon, a friend of Appellant's, was living with them. On the day before Appellant presented at the hospital with the child, the child was never outside the supervision of Appellant. In fact, the child had not been alone with anyone other than Appellant since approximately 9:00 a.m. on Tuesday, June 21st. On that Wednesday, Buckmon left the house at approximately 11:00 a.m. to go visit his children and did not return until approximately 5:30 p.m. Appellant worked the night shift at the Hot Spot gas station and had a meeting at 2:00 that afternoon. Appellant woke up sometime after Buckmon left that morning. Appellant's ex-boyfriend, Oliphant[4], was to pick Appellant and child up at approximately 1:00 p.m. to take Appellant and child to the meeting since Appellant did not have a car.[5] Appellant was running late in getting ready for the meeting and her boss had threatened to fire anyone that missed the meeting. Appellant stated that before Oliphant arrived to pick them up, around 1:00 p.m., she popped the child with her hand once on her fully clothed rear end because the child was moving slowly. They proceeded to the meeting, and all three attended. While at the meeting, Oliphant asked the child if she was feeling okay, and commented that she was walking funny. An employee who heard Oliphant make that statement testified that she did not notice anything wrong with the child and did not notice blood on the back of her jeans. After the meeting, Oliphant, Appellant, and the child ran an errand, and then Appellant dropped Oliphant at his house, and returned to her own home with the child in Oliphant's car.[6]

---

4. Oliphant was deceased at the time of trial.

5. It took approximately 45 minutes to get to the Hot Spot from Appellant's house.

6. Oliphant had recently had a toe amputated and Appellant spent much of that week driving to and from Oliphant's house to change his dressings and to bring him food.

Buckmon returned to the home around 5:30 p.m. and noticed drops of blood on the toilet seat. When Buckmon asked Appellant if it was hers, she stated it was not, but did not look at the toilet seat or investigate further to see if the child was okay. Appellant cooked dinner and gave it to the child at approximately 7:00 p.m. After eating some pasta, the child began to vomit on the floor. Appellant told her to go to the bathroom to clean herself up and then told her to clean up the vomit. Appellant then went to the bedroom that she shared with the child and laid out clothing for the child to change in to. The child took her clothing off and dropped it on the side of the bed, and changed into the clothing Appellant laid out for her. The child went to bed at approximately 7:30 p.m. Appellant was scheduled to work the night shift at the Hot Spot that evening, so after Appellant cleaned up for the evening, she crawled into bed with the child and napped until approximately 10:45 p.m., when Buckmon woke her up so she could get ready for work. Appellant stated that the child was snoring when she leaned in to kiss her before she left for work at approximately 11:00 p.m. Appellant told Buckmon to fix the child a peanut butter and jelly sandwich if she woke up since she had thrown up her dinner. Buckmon testified that he was not sure whether the child got out of the bed after Appellant left for work, but he stated that he thought he heard her turn the television on in her room and that he called in to her at approximately midnight, telling her to turn the television off, and she did. Buckmon never went into the bedroom to check on the child.

When Appellant returned to the house from work at approximately 10:00 a.m. on Thursday morning, she asked Buckmon if the child had awoken, and he answered in the negative. Appellant then got into the bed with the child and went to sleep. She testified that she checked the bed to make sure the child had not wet the bed since she was prone to doing so. In one of the taped confessions, Appellant stated she thought the child was alive when she got into the bed because she thought she saw movement, but upon further questioning, Appellant stated that the child could have been dead at this point because she did not check to see if she was breathing or moving. At approximately noon, Buckmon's ex-wife called, waking Appellant, and Buckmon went into the room to speak

with her, but did not notice the condition of the child. At that time, Appellant asked Buckmon to wake her up at 2:30 p.m. so that she could take Oliphant to the foot doctor. Buckmon woke Appellant at 2:34 p.m. and Appellant went to the bathroom to fix her hair. The child was still in the bed (and had been in the bed for approximately 19 hours). When Appellant called out to the child to wake her up and did not receive a response, she said, "you know you're faking," but then noticed vomit in her mouth and nose and all over the pillowcase and sheet.[7] After Buckmon's unsuccessful attempt to revive her, she placed the child in the backseat of Oliphant's car and drove her to the emergency room, believing she could get care quicker than by calling an ambulance.

Appellant denies causing the abrasions to the buttocks of the child and denies that she hit her with the force to cause the hematoma. Appellant claims that the injury to the child's lip happened while they were playfully wrestling on the Tuesday before the child died when Appellant's hand accidentally hit her lip. Appellant was not aware how the child received the bruise on her forearm, but claimed she may have accidentally grabbed her too hard. Several witnesses that knew Appellant well and had lived with her testified that she was not a violent person. Buckmon stated that in the month that he lived with her, he never witnessed Appellant spanking the child, and her main mechanism of punishment was to restrict the child from watching cartoons.

### ISSUES

I. Whether the circuit judge properly admitted into evidence State's Exhibit 31, a photograph of the child while she was alive and well.

II. Whether the circuit judge properly admitted the pieces of wood found at the home of the child for the purpose of showing the type of instrument that could have caused the injuries to the child.

### STANDARD OF REVIEW

■ The admission or exclusion of evidence is an action within the sound discretion of the circuit court and will not be

---

7. Investigators did not find any vomit on the sheets and pillowcases as Appellant represents, and no witness from the hospital testified that the child had vomit on her.

disturbed on appeal absent an abuse of discretion. *State v. Williams*, 386 S.C. 503, 509, 690 S.E.2d 62, 65 (2010). An abuse of discretion occurs when the conclusions of the circuit court are either controlled by an error of law or are based on unsupported factual conclusions. *State v. Douglas*, 369 S.C. 424, 429–30, 632 S.E.2d 845, 848 (2006).

ANALYSIS

## I. Photograph

■ Appellant contends that the admission of State's Exhibit 31, a professional photograph of the child taken when she was alive and well, was irrelevant to proving Appellant's guilt and should have been excluded pursuant to *State v. Langley*, 334 S.C. 643, 515 S.E.2d 98 (1999). We disagree.

■ "Evidence is relevant if it has a direct bearing upon and tends to establish or make more or less probable the matter in controversy." *Id.* at 647, 515 S.E.2d at 101 (citing Rule 401, SCRE). "A photograph should be excluded if it is calculated to arouse the sympathy or prejudice of the jury or is irrelevant or unnecessary to substantiate facts." *Id.* (citation omitted). However, "there is no abuse of discretion if the offered photograph serves to corroborate testimony." *State v. Johnson*, 338 S.C. 114, 122, 525 S.E.2d 519, 523 (2000) (citation omitted).

In *Langley*, this Court found the admission of a photograph of the victim, taken in his high school band uniform, was reversible error because it was not relevant in proving the guilt of the appellant in that case. *Id.* at 648, 515 S.E.2d at 100. In so finding, the Court discounted the State's argument that the photograph was admitted to establish the identity of the victim because the identity of the victim was not an issue in that case. *Id.* at 648 n. 3, 515 S.E.2d at 100 n. 3. The Court concluded that "the only possible purpose of ... [the] introduction of the photograph was to distance the victim from the drug dealing ... and to neutralize testimony by the State's witnesses regarding his drug use." *Id.*

Appellant objected to the admission of State's Exhibit 31 at trial, arguing the picture was highly prejudicial, especially because the shorts the child was wearing in the photograph

were the same shorts in which she died and that were submitted into evidence with blood on them. Appellant argued that it was not necessary to admit the photograph to show the age and size of the child since Dr. Sexton could testify as to the size of the child and the jury could infer her size from the testimony of the child's age. In overruling Appellant's objection, the circuit judge found the picture was not inflammatory: "[i]t's just a simple picture of the little child prior to death, and it gives the jury an opportunity to see what she looked like."

Reviewing the admission of this evidence through an abuse of discretion lens, we find that the picture of the child was relevant because it substantiated Dr. Sexton's testimony that the child's sickle cell trait was not outwardly apparent and that the she was an otherwise healthy and vibrant child. Without seeing the child when she was alive, Dr. Sexton's testimony could have elicited an impression of a sickly and fragile child, which may have affected the establishment of guilt. Therefore, we believe this picture had a purpose independent of arousing sympathy, and was properly admitted.

## II. Wooden Sticks

The State sought to introduce into evidence two pieces of wood retrieved from the trashcan outside of Appellant's house (Exhibit 28), and the circuit judge overruled Appellant's objection to their admission. On appeal, Appellant argues the wooden sticks were more prejudicial than probative, under Rule 403, SCRE, and that their admission was reversible error. We find that the prejudicial value of the wooden sticks clearly outweighed their probative value, and therefore it was an abuse of discretion to allow them into evidence. However, after due consideration, we find that error to be harmless.

While searching Appellant's house on the day the child presented at the hospital, officers confiscated two pieces of wood with staples protruding from them that were lying atop a rollaway trashcan outside of Appellant's residence. On each of these pieces, there is a black faux alligator skin material that has a rough surface on one side and the other side appears smooth. The side with the rough surface has staples protruding from it approximately every eight inches. The State argued that the probative value of these sticks was to

demonstrate the type of object that could have caused the child's injuries, and the question of whether or not these sticks were actually used on the child went to the weight and not the admissibility of the evidence.

Dr. Sexton testified repeatedly that he could not say the particular object caused the injuries, but that the sticks were of consistent weight and had a rough surface consistent with the object that caused the child's injuries. Dr. Sexton testified that the child was likely hit with an object that weighed at least as much as these sticks. However, at one point Dr. Sexton stated that these sticks may not have been heavy enough to have produced the impact necessary to cause the hematoma: "so it could be an object that narrow but heavier than something of this sort." Dr. Sexton testified that the black surface on the sticks could certainly have caused the abrasions to the child's buttocks, but stated repeatedly that the child could not have been hit with the part of the stick that contained staples because the child did not have any puncture wounds.[8] Dr. Sexton stated that it was possible that the opposite side of the sticks (without the staples) caused the injury because although "it looks planed ... if you rub your finger across it, it's rough." However, later in his testimony, he refers to that side as the "smooth side."

When questioned about the lack of forensic evidence on the sticks, Dr. Sexton verified that if the child's pants were down while being beaten, he "would expect there to be some DNA transfer to that object because the skin was torn, usually tiny fragment of skin or some of the fluid [sic]." He testified that although it was possible the child could have received the abrasions with clothing on, abrasions result more commonly by an object's direct contact with the skin. When asked if he would expect to find fibers of clothing in the rough surfaces of the stick if the child were beaten with clothing on, he stated "perhaps you would." After this line of questioning, Dr. Sexton appeared to concede that he did not believe the sticks were the actual weapon, stating, "So maybe—like I said,

---

8. The staples protrude from the black surface of these sticks every eight inches and therefore it would require deliberate effort to repeatedly strike another using this side of the stick without inflicting puncture wounds.

maybe it's not this object. It's just this object is consistent size-wise and weight wise."

The State did not produce any evidence that these sticks were used in the commission of the crime against the child, other than the fact they were found lying atop a trashcan outside Appellant's house. If the only probative value of these sticks was to show the jury the *type* of object that could have been used to harm the child, it would have been far less prejudicial to have shown an object with a rough surface and of sufficient weight that was not tied to the crime scene, as were these sticks. Although Dr. Sexton made clear that the child was not hit with an object that would cause puncture wounds, the visual created by these sticks with large protruding staples was highly prejudicial. Therefore, we find the prejudicial value of this evidence clearly outweighed its probative value and it was an abuse of discretion to allow the sticks into evidence.

 Still, we believe that the error in admitting this highly prejudicial piece of evidence could not have contributed to the guilty verdict, and was therefore harmless. Whether an error is harmless depends on the particular circumstances of the case, and therefore a reviewing court must look to the entire record to determine the effect the error had on the verdict. *State v. Clark*, 315 S.C. 478, 484, 445 S.E.2d 633, 636 (1994) (J. Toal, dissenting). "In order for a constitutional error to be harmless, the error must have been harmless beyond a reasonable doubt." *Id.* This means the reviewing court can conclude, beyond a reasonable doubt, the error did not contribute to the verdict. *State v. Mizzell*, 349 S.C. 326, 334, 563 S.E.2d 315, 319 (2002).

The testimony of Dr. Sexton as to the time of death, and the time he believed the child sustained the injuries, combined with the blood evidence found in the house, and Appellant's own statements about the events of that Wednesday support the jury's finding that the only person who could have inflicted these injuries on the child was Appellant. Dr. Sexton testified that the child could have died anywhere from 8:00 p.m. on Wednesday, June 22nd to 2:00 a.m. the next Thursday morning based on a host of variables uncovered during the autopsy. Appellant testified that the child was snoring when she kissed

her good-bye shortly before 11:00 p.m. Buckmon stated that he heard the television on the child's room and asked her to turn it off at around midnight, and to his knowledge, she complied.[9] Therefore, the child most likely perished between 11:00 p.m., at the earliest, and 2:00 a.m. on Thursday, June 23rd. Dr. Sexton testified that based on the early phase of the inflammatory reaction to her injuries, the child most likely sustained the injuries to her buttocks approximately 12 to 15 hours before her death.[10] This would mean the child was likely beaten between 9:00 a.m., at the earliest, and 2:00 p.m. on Wednesday, June 22nd—the period of time when Appellant was with the child before leaving for the meeting at the Hot Spot. Appellant verified that the last time the child was with someone else, outside of her presence, was at 9:00 a.m. on Tuesday when Appellant picked the child up from Oliphant's house after a night of work.[11] Appellant was with the child all day on Tuesday and Wednesday morning and testified she did not notice anything wrong. Blood resulting from the injury was found on the clothing that the child wore on Wednesday, and Buckmon noticed the blood on the toilet seat on Wednesday, as well. The State offered Buckmon's testimony that he was not at the house from 11:00 a.m. until 5:30 p.m. that day. Buckmon's ex-wife and Appellant, herself, corroborated this testimony.

The circumstantial evidence in this case points conclusively to the guilt of Appellant to the exclusion of every other reasonable hypothesis. Appellant was the only person who

---

9. There is no testimony addressing whether the television was on when Appellant returned home from work on Thursday and crawled in the bed with the child.

10. Although Dr. Sexton testified that a hand slap could have possibly exacerbated an earlier injury to the child, causing a hematoma, we do not believe he intended to infer that the hematoma injury occurred any earlier than 12 to 15 hours before death, because this calculation was based on the extent of inflammatory response found at the site of the hematoma.

11. On cross-examination, Appellant stated, "The only time [the child] was alone with anybody was that Monday." The timeline appears to get somewhat confused because of Appellant's overnight work, but after carefully reading the testimony, we believe it is accurate to conclude Appellant left the child with Oliphant on Monday evening and returned to pick her up on Tuesday morning.

could have inflicted the wounds to the child during the time frame supported by the evidence. During its deliberations the jury appeared to be concerned with the timeline of events during the days leading up to the child's death. The jury foreperson sent a return and asked to hear Appellant's testimony of the day Appellant took a shower with the child. The jury specifically asked to hear Dr. Sexton's testimony about the injury occurring 12 to 15 hours before death, and his testimony that a hand slap could have possibly triggered the sickling of the cells. Therefore, the paramount concern of the jury appeared to be the question of whether or not another person could have caused the child's injuries based on timeline of events, not the object with which the child was beaten. Accordingly, we believe beyond a reasonable doubt that the admission of these wooden sticks into evidence did not contribute to the jury's guilty verdict.

## CONCLUSION

For the foregoing reasons, we affirm Appellant's conviction. **AFFIRMED.**

BEATTY, KITTREDGE and HEARN, JJ., concur.

PLEICONES, J., dissenting in a separate opinion.

Justice PLEICONES.

I respectfully dissent because, as explained below, I find the erroneous admission of the wooden sticks constituted reversible error. I would also find the trial court erred in allowing the State to introduce the victim's photograph as it was irrelevant under State v. Langley, 334 S.C. 643, 515 S.E.2d 98 (1999), but that any error was harmless in light of appellant's introduction of several pictures of the child.

I agree with the majority that the circuit court committed error in admitting the "highly prejudicial" wooden sticks. Although I would not characterize this error as one of constitutional magnitude, were I to apply the "harmless beyond a reasonable doubt" standard, I would find reversible error here. In my opinion, the standard for reviewing ordinary evidentiary errors such as the one here is whether there is a reasonable probability that the wrongly admitted evidence

influenced the jury's verdict. *E.g., State v. Green*, 397 S.C. 268, 724 S.E.2d 664 (2012). Whether there is such a probability here is a close question.

The majority finds the error harmless by focusing on the evidence that appellant was the perpetrator. As I view the record, I believe the jury was concerned not so much with the question whether appellant beat the child, but rather whether her actions constituted "child abuse and neglect" that "harmed" the victim within the meaning of the homicide by child abuse statute.[12] Under the statute, child abuse and neglect is defined as "an act or omission by any person which causes harm to the child's physical health or welfare." § 16-3-85(B)(*l*). Harm is defined in relevant part as "inflicts or allows to be inflicted upon the child physical injury, including injuries sustained as a result of excessive corporal punishment." § 16-3-85(B)(2)(a). As explained below, I believe the critical issue in this case was whether the corporal punishment inflicted on this child was excessive and therefore met the statutory definition of harm.

The jury began deliberating at 1:15 pm. Around 4:00 pm the jury asked to be recharged on the definitions found in the statute, to rehear appellant's testimony of when she took a shower with the victim, and "Dr. Sexton's testimony from A. to Z." The jury later asked for two parts of Dr. Sexton's testimony to be replayed and to be recharged on the statutory

---

12. S.C.Code Ann. § 16-3-85(A) and (B) provides:

(A) A person is guilty of **homicide** by **child abuse** if the person:

(1) causes the death of a child under the age of eleven while committing child abuse or neglect, and the death occurs under circumstances manifesting an extreme indifference to human life; or

(2) knowingly aids and abets another person to commit child abuse or neglect, and the child abuse or neglect results in the death of a child under the age of eleven.

(B) For purposes of this section, the following definitions apply:

(1) "child abuse or neglect" means an act or omission by any person which causes harm to the child's physical health or welfare;

(2) "harm" to a child's health or welfare occurs when a person:

(a) inflicts or allows to be inflicted upon the child physical injury, including injuries sustained as a result of excessive corporal punishment;

(b) fails to supply the child with adequate food, clothing, shelter, or health care, and the failure to do so causes a physical injury or condition resulting in death; or

(c) abandons the child resulting in the child's death.

definitions. The jury was sent home for the evening at 6:44 pm. They deliberated the next day for more than two hours before returning the guilty verdict. In light of the length of the deliberations, the jury's apparent focus on "abuse," "harm," and the expert testimony as to time of injury and manner and cause of death, including the medical testimony that the corporal punishment inflicted on this child led to her death only because of her undiagnosed sickle cell trait, and considering the "highly prejudicial" nature of the sticks, I am compelled to conclude that there is a reasonable probability that this improperly admitted evidence influenced the jury's verdict. *State v. Green, supra.* I would therefore reverse.